IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL,<br>Plaintiff,<br>v.<br>MICHAEL O. LEAVITT, et al.,<br>Defendants. | ) | Civ. Action No. 06-05 ET |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:
DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

CLIFFORD PIERCE
Attorney
U.S. Department
of Health and Human Services

PETER D. KEISLER
Assistant Attorney General

ROBERT CLARK CORRENTE
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov
Attorneys for Defendant

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The "Reasonable Cost" Era. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Cost Limits, the IME Adjustment and the FTE Count. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C. The Prospective Payment System. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D. The Exclusion of Research Time from the FTE Count. . . . . . . . . . . . . . . . . . . . . . . . . 10

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I. The Secretary Properly Excluded Scholarly Research from the FTE Count Because Research Is Not a Cost "Subject to the Prospective Payment System". . . . . . . . 14

II. The Secretary Did Not Apply the 2001 Regulation Retroactively.. . . . . . . . . . . . . . . . . . . 15

III. The Secretary Has Statutory Authority to Exclude Research Time from the FTE Count. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV. Plaintiff Failed to Demonstrate that Any Research Time Was Related to Patient Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## PRELIMINARY STATEMENT

This action challenges a construction of Medicare law by the Secretary of Health and Human Services. Because the Secretary's interpretation is a reasonable one, it is entitled to deference. Summary judgment therefore should be granted in favor of defendants.

Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. §§ 1395, et seq., establishes a federal health insurance program for the elderly and disabled. Hospitals are reimbursed for "the operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(d)(1)(A), under a "prospective payment system" ("PPS") designed to encourage cost efficiency. Teaching hospitals that train interns and residents receive an add-on to the PPS payment to compensate them for increases in the cost of inpatient hospital services presumed to occur as an "indirect" consequence of the "involvement" of student doctors in "patient" care. H.R. Conf. Rep. No. 105-217 at 816 (1997), as reprinted in 1997 U.S.C.C.A.N. 176, 437. This adjustment is known as the "indirect medical education" ("IME") payment. The IME payment is determined by a complicated formula. Part of the formula requires the hospital to organize the time worked by student doctors into "full-time equivalent" ("FTE") manpower units and add the units together to produce an "FTE count." Under the regulations in effect at the times relevant to this case, the FTE count was limited to the time spent while a student doctor was "assigned," 42 C.F.R. § 412.105(f)(1)(ii),[1] to the "portion of the hospital subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), or to the "outpatient department of the hospital." 42 C.F.R. § 412,105(f)(1)(ii)(B).

---

[1] During the 1996 cost-reporting year at issue in this case, the relevant regulation appeared at 42 C.F.R. § 412.105(g)(1) (1996). It was subsequently moved to 42 C.F.R. § 412.105(f)(1), and some sections were re-numbered in 2001. For the sake of simplicity, this memorandum will cite to the current version of the regulation.

The issue in this case is whether student time spent while assigned to the area of purely scholarly research should be included in the FTE count. The answer is no. Since the beginning of the Medicare program, research has been considered an allowable cost only if it was directly related to the diagnosis and treatment of an individual patient. See 42 C.F.R. §§ 413.5(c)(2), 413.90(a). Accordingly, the Secretary does not consider research in which student doctors engage to be "subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), unless it is directly related to the treatment of an identifiable patient. In 2001, the Secretary clarified this "longstanding" interpretation, 66 Fed. Reg. 39,828, 39,896 (Aug. 1, 2001), by making it explicit that "time spent by a resident in research that is not associated with the treatment and diagnosis of a particular patient is not countable." 42 C.F.R. § 412.105(f)(iii)(B). That construction should be upheld here.

## BACKGROUND

### A. The "Reasonable Cost" Era

The analysis begins at the inception of the Medicare program, when hospitals were reimbursed on the basis of "the reasonable cost," 42 U.S.C. § 1395f(b)(1), of "inpatient hospital services." 42 U.S.C. § 1395d(a)(1). Reasonable cost was defined as "the cost actually incurred" by the hospital in furnishing care to Medicare patients, minus "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). What constituted the necessary costs of needed health services was "determined in accordance with regulations" promulgated by the Secretary. Id.

The regulations recognized as reasonable only those costs that were "related to the care of beneficiaries," 42 C.F.R. § 413.9(a), and "necessary and proper expenses of an institution in the production of services" to those Medicare patients. 42 C.F.R. § 413.5(a). At teaching hospitals,

"[c]osts incurred for research purposes, over and above usual patient care," 42 C.F.R. § 413.5(c)(2), were excluded from the reimbursable operating costs of the hospital, id.; 42 C.F.R. § 413.90(a), because research was considered to be "necessary and proper" in the production of health-care services, 42 C.F.R. § 413.5(a), only if it was "conducted in conjunction with, and as a part of, the care of patients." 42 C.F.R. § 413.90(b)(2).[2]

To help distinguish between reimbursable research (directly related to patient care) and non-reimbursable research (of a purely scholarly nature), hospitals were required to establish "[a] separate cost center" to account for "all direct and indirect costs associated with research." Provider Reimbursement Manual § 504.1. (Administrative Record ("A.R.") at 406). "Costs applicable to the research cost center" included "bench research costs and certain other costs that may be incurred in the patient care areas for research purposes," such as "the salaries of personnel with higher professional qualifications than ordinarily needed to furnish usual patient care" and "the cost of equipment and facilities which are more complex and specialized than needed to render usual patient care." Id. This critical distinction between patient-related research and pure-scholarly research remained consistent throughout the subsequent history of the Medicare program.

**B. Cost Limits, the IME Adjustment and the FTE Count**

Although it was comparatively simple to administer, the original reasonable-cost regime had one big drawback: it gave hospitals little incentive to economize and resulted in spiraling Medicare expenditures. In 1972, Congress attempted to address the problem by authorizing the

---

[2] In statutory terms, scholarly research was not an "inpatient hospital service[]," 42 U.S.C. § 1395d(a)(1), because it was "unnecessary in the efficient delivery of needed health services" to patients. 42 U.S.C. § 1395x(v)(1)(A).

Secretary to "provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable." 42 U.S.C. § 1395x(v)(1)(A). These cost limits were known as the "Section 223" limits after the part of the legislation in which they were enacted.[3] The cost limits, which were published annually in the Federal Register, were "based on estimates of the costs necessary in the efficient delivery of needed health services to individuals." Id. For purposes of the limits, estimates of reasonable costs continued to exclude expenses "determined in accordance with regulations to be unnecessary in the efficient delivery of" covered health services. Id. Because the cost of scholarly research was determined to be unnecessary to the efficient delivery of health services (and therefore simply not reimbursable as a cost of furnishing covered services to beneficiaries), it was not subject to the cost limits.

The cost-limit regime had many advantages, but it had one unintended consequence: it was perceived to cause a change in the relative levels of Medicare reimbursement received by teaching hospitals and their non-teaching counterparts. This was because hospitals that train recent medical school graduates (interns and residents) are presumed to indirectly incur "increased patient care costs" – caused by factors such as "increased diagnostic testing, increased numbers of procedures prescribed, higher staffing ratios, and a more severely ill patient population" – over and above the direct costs of medical education programs such as "salaries for residents and teachers and classroom costs." H.R. Rep. No. 99-241(I) at 14 (1985), as reprinted in 1986 U.S.C.C.A.N. 579, 592. Under the pure reasonable-cost system, these indirect costs automatically translated into higher levels of Medicare reimbursement for the teaching hospitals,

[3] Social Security Act Amendments of 1972, Pub. L. No. 92-603, § 223, 86 Stat. 1329, 1411 (1972).

because they made their costs actually incurred to furnish needed health-care services that much higher. But when reasonable-cost reimbursement was made subject to cost limits imposed uniformly on teaching hospitals and non-teaching hospitals alike, the effect of the cost limits was to gradually compress the differential in payment attributable to the indirect effect of performing teaching functions.

In 1980, the Secretary sought to "significantly improve[] the accuracy of the methodology we use to set the limits" by creating an "adjustment" designed to account for a perceived connection between "a gradual increase" in "overall levels of inpatient general routine per diem operating costs." and "increased levels of intern and resident training" at teaching hospitals. 45 Fed. Reg. 41,868, 41,870 (June 20, 1980). "Among teaching hospitals of similar size and location," the Secretary explained, inpatient operating costs appeared to "increase in direct proportion to the number of interns and residents (in approved programs)" that "the hospital employs <u>to furnish services to its patients</u>." 45 Fed. Reg. 21,582, 21,584 (Apr. 1, 1980) (emphasis added). "For example, a hospital with an approved medical education program may be required, for training purposes, to maintain more detailed and complete medical records than a non-teaching hospital." <u>Id</u>. "To prevent a disproportionate number of teaching hospitals from being adversely affected by the limits," <u>id</u>., the Secretary set cost limits for teaching hospitals by means of a proxy formula.

The first step in the formula was to determine the ratio of "full-time equivalent" residents in approved medical education programs to the number of beds in the hospital. 45 Fed. Reg. at 41,874. The second step was to multiply that ratio by a specified factor for every .1 (above zero) in the ratio. <u>Id</u>. The second step was designed to estimate the <u>degree</u> of the differential (expressed as a percentage) between the inpatient operating costs generally experienced by

teaching hospitals and the inpatient operating costs experienced by non-teaching hospitals. 45 Fed. Reg. at 21,584. The first step – the resident-to-beds ratio – was designed to estimate the specific occasions on which the indirect effects of medical education on the costs of inpatient care were likely to be experienced by each particular teaching hospital. The final step was to multiply the product of the first two steps by the cost limit for each service or group of services, thereby producing an upward adjustment for teaching hospitals. 45 Fed. Reg. at 41,874. This methodology was left unchanged in the notice for 1981, 46 Fed. Reg. 33,637, 33,639 (June 30, 1981), and for 1982. 47 Fed. Reg. 43,296, 43,310 (Sept. 30, 1982).[4]

For purposes of determining FTE time under the 1980-82 notices, the teaching hospital was "allowed to count only interns and residents" who were "employed at the hospital," and it was required to exclude all "those who are on the hospital's payroll but furnish services at another site." Id. (emphasis added). In this context, the word "services" meant only those "services" that a hospital provides "to its patients," 45 Fed. Reg. at 21,584 – that is, those "needed health services" furnished "to individuals" covered by Medicare. 42 U.S.C. § 1395x(v)(1)(A). As discussed earlier, these needed patient-care services were the only kind of services that were subject to the cost limits and, in turn, the only kind of costs subject to being adjusted upward to account for the indirect effects of medical education on inpatient operating costs. Thus, taken as a whole, the 1980 notice could reasonably be construed as indicating that the FTE count should include only the time spent furnishing patient-care services by interns and residents employed by the hospital. Since scholarly research was not an operating cost subject to the cost limits, it

[4] In the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 101, 96 Stat. 324, 331 (1982), Congress redesigned the cost limits, see 42 U.S.C. § 1395ww(a)(1)(A)(i), but continued to authorize IME adjustments. 42 U.S.C. § 1395ww(a)(2).

would have been reasonable for the Secretary to exclude research time from the count

**C. The Prospective Payment System**

In 1983, Congress scrapped the idea of basing hospital reimbursement under Medicare on reasonable costs and created a new "prospective payment system" to reimburse acute-care hospitals for the "operating costs of inpatient hospital services." 42 U.S.C. § 1395ww(d)(1)(A).[5] Under this prospective payment system, patient care is divided into several hundred "diagnosis-related groups," 42 U.S.C. § 1395ww(d)(4), and the Secretary establishes a different "payment rate" for each such group each year. 42 U.S.C. §§ 1395ww(d)(2), (3). Hospitals that "beat" the federal rate earn more per patient. The regime thereby encourages doctors who furnish services in the portions of the hospital subject to the prospective payment system to improve"efficiency in the provision of services by rewarding cost/effective hospital practices." H.R. Rep. No. 98-25(I) at 25 (1983), as reprinted in 1983 U.S.C.C.A.N. 219, 351.

The prospective payment system for inpatient operating costs governs "the amount of the payment" that is made by Medicare "with respect to the operating costs of inpatient hospital services" of a "subsection (d) hospital." 42 U.S.C. § 1395ww(d)(1)(A). A "subsection (d) hospital" is defined, by means of exclusion, to include only acute-care hospitals. 42 U.S.C. § 1395ww(d)(1)(B). The "operating costs of inpatient hospital services" are defined, in pertinent part, as "all routine operating costs, ancillary service operating costs, and special care unit

---

[5] See Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149 (1983). Although many "prospective payment systems" have now been implemented for different aspects of Medicare coverage, unqualified references to "the" or "a" prospective payment system or "PPS" are commonly understood to refer to this first payment system for inpatient operating costs. See, e.g., Fischer v. United States, 529 U.S. 667, 685 (2000); Regions Hosp. v. Shalala, 522 U.S. 448, 461 (1998); Palisades Gen. Hosp., Inc. v. Leavitt, 426 F.3d 400, 401 (D.C. Cir. 2005).

operating costs with respect to inpatient hospital services as such costs are determined on an average per admission or per discharge basis." 42 U.S.C. § 1395ww(a)(4). These are the only "covered hospital inpatient services furnished to beneficiaries" that are subject to being "paid for under the prospective payment system." 42 C.F.R. § 412.20(a).

As discussed earlier, the Secretary has never understood the term "routine operating costs" to include the costs of scholarly research. For this reason, the "costs of approved educational activities" are expressly excluded from the definition of the "operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(a)(4), paid for by the prospective payment system. 42 U.S.C. § 1395ww(d)(1)(A).[6] "[W]ith respect to indirect medical education expenses," however, Congress instructed the Secretary to make an IME adjustment "based on the ratio of residents to beds, that is applied in the so-called section 223 limits on reimbursement under present law." H.R. Rep. No. 98-25(I) at 140, as reprinted in 1983 U.S.C.C.A.N. at 359. Accordingly, the IME statute instructs the Secretary to "provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a) (2) of this section," 42 U.S.C. § 1395ww(d)(5)(B), subject to certain revisions in the "second step" of the IME formula that are not relevant here.

The IME formula used to adjust the old cost limits relied on "the ratio of FTE interns and residents to beds as a variable" to measure the "effect of teaching activity on operating costs." 48 Fed. Reg. 39,752, 39,778 (Sept. 1, 1983) (emphasis added); see also 45 Fed. Reg. at 21,584 (count applies to "interns and residents (in approved programs)" that "the hospital employs to

[6] Direct costs of medical education are funded outside the prospective payment system established in 1983. 42 U.S.C. § 1395ww(h).

furnish services to its patients") (emphasis added). This meant that "the application of the indirect medical education payment was limited to hospitals that employed interns and residents who furnished services" – in the sense of patient-care services – "on their premises." 50 Fed. Reg. 35,646, 35,681 (Sept. 3, 1985) (emphasis added).[7]

The regulations implementing the IME adjustment currently appear at 42 C.F.R. § 412.105. Under the version of the regulations in effect for the 1996 cost-reporting year at issue in this case, an intern or resident had to be in an approved medical education program and "assigned to one of" two specified "areas" in order to be included in the FTE count. 42 C.F.R. § 412.105(f)(1)(ii). The first area was "[t]he portion of the hospital subject to the prospective payment system." 42 C.F.R. § 412.105(f)(1)(ii)(A). The second was "[t]he outpatient department of the hospital." 42 C.F.R. § 412.105(f)(1)(ii)(B). "Full-time equivalent status" was "based on the total time necessary to fill a residency slot," but "[a] part-time resident or one working in an area of the hospital other than" the portion subject to PPS or the outpatient department "would be counted as a partial full-time equivalent based on the proportion of time assigned to" the portion subject to PPS or the outpatient department. 42 C.F.R.

---

[7] In 1984, the Secretary amended the IME adjustment to comport with § 2307(b)(1) of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, 1037 (1984), which amended the statutory scheme to require the Secretary to "not distinguish between those interns and residents who are employees of a hospital and those interns and residents who furnish services to a hospital but are not employees of such hospital." 42 U.S.C. § 1395ww(d)(5)(B)(iii) (emphasis added). See 49 Fed. Reg. 34,728, 34,729, 34,747, 34,763 (Aug. 31, 1984). The purpose of the amendment was to make sure that "all of the interns and residents furnishing services at the hospital" were counted, regardless of "[w]ho employs them." H.R. Conf. Rep. No. 98-861 at 1312 (1984), as reprinted in 1984 U.S.C.C.A.N. 1445, 2000 (emphasis added). Once again, the word "services" in the statute and legislative history can reasonably be construed to refer to the "inpatient hospital services" that comprise the allowable operating costs of subsection (d) hospitals, 42 U.S.C. §§ 1395ww(a)(4), 1395ww(d)(1)(A), and not the "services" that might be provided by a research assistant to his hospital employer in an everyday sense.

§ 412.105(f)(1)(iii) (A). The portion of the hospital subject to PPS is the share that generates "operating costs" necessary to provide "inpatient hospital services" to Medicare beneficiaries. 42 U.S.C. § 1395ww(d)(1)(A). Portions of the hospital that generate costs other than those reimbursable under the prospective payment system, such as "a freestanding family practice center" or "an excluded hospital unit," 42 C.F.R. § 412.105(f)(1)(iii) (A), are not included.[8]

**D. The Exclusion of Research Time from the FTE Count**

Because costs generated by scholarly research over and above usual patient care costs have never been considered to be patient-care operating expenses under Medicare, the Secretary has determined that the time that interns and residents spend assisting teaching physicians in such research does not occur in the "portion" of the hospital "subject to the prospective payment system," as those terms are used in 42 C.F.R. § 412.105(f)(1)(ii)(A). The 1983 regulations therefore continued to emphasize that "only interns and residents" who were "employed at the hospital" were included in the count and "those who are on the hospital's payroll but furnish services at another site will not be taken into account." 48 Fed. Reg. at 39,778 (emphasis added). This meant that the IME payment was limited to "interns and residents who furnished services on [the hospital's] premises." 50 Fed. Reg. at 35,681 (emphasis added). Accordingly, § 2405.3.F.2 of the Provider Reimbursement Manual expressly provided that a hospital "must not count an individual in the indirect medical education adjustment" if, among other things, "[t]he individual is engaged exclusively in research," A.R. at 145, because "[r]esearch" conducted by interns or residents was "not classified as time worked in the part of the hospital subject to PPS."

---

[8] An excluded hospital unit is one where services excluded from the statutory definition of a "subsection (d) hospital" are performed. 42 U.S.C.§ 1395ww(d)(1)(B). See 42 C.F.R. Subpart B, §§ 412.20-412.30.

Hospital and Skilled Nursing Facility Audit Program Exhibit 13, ¶ 10.D, at 13-21-13.22 (1996) (Def. Ex. A).

In 2001, the Secretary promulgated a regulation designed to resolve any "confusion" that might have continued to linger "in the provider community" as to "whether the time that residents spend performing research is countable" for purposes of the IME adjustment. 66 Fed. Reg. at 39,896. The regulation explicitly provides that, in isolating the "portion of the hospital subject to the prospective payment system," 42 C.F.R. § 405.105(f)(1)(ii)(A), and the "outpatient department," 42 C.F.R. § 405.105(f)(1)(ii)(B), the "time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient is not countable." 42 C.F.R. § 405.105(f)(1)(iii) (B).[9]

**STATEMENT OF THE CASE**

Plaintiff is a teaching hospital that trains interns and residents. Compl. at ¶ 22. In its cost report for the 1996 fiscal year, it divided the time worked by these students into various "service areas." A.R. at 10; see id. at 512-1020. One service area was designated as "Research." See, e.g.., id. at 10. The other areas – such as intensive care and medical/surgical – were devoted to patient care. Id. The government contractor that processed the reports excluded the research area

[9] In issuing this clarifying regulation, the Secretary reiterated his "longstanding" view that the indirect costs of medical education are "those additional costs (that is, patient care costs) incurred by hospitals with graduate medical education programs," 66 Fed. Reg. at 39,897 (emphasis in original), and therefore, to the extent that residents are "engaged exclusively in research," they "do not contribute to" the "higher operating costs," id. at 39,898, that the IME adjustment is intended to redress. The Secretary also reiterated his view that resident time spent "exclusively" in research should not be included in the FTE count, regardless of whether "the resident is engaged only in research or spends only part of his or her time on research" or whether the research is "clinical in nature." Id. at 39,896 (emphasis omitted). He emphasized that he was "not proposing a change in Medicare policy," because "it has always been Medicare policy to require the hospital to distinguish between time spent by residents involved exclusively in research and time spent on patient care." Id. at 39,898 (emphasis in original).

from the FTE count, thereby reducing the count by a factor of 12.6 FTE residents. Id. at 2 n.1.

Plaintiff appealed to the Provider Reimbursement Review Board ("PRRB" or "Board"), arguing that "the statutes and regulations in effect in 1996" did not exclude any "research time" from the FTE count. A.R. at 95. In the alternative, the hospital contended that more than half of the excluded time – 7.49 FTE residents – should be restored on the ground that "this time was associated with the treatment or diagnosis of particular patients." Id. at 96 (emphasis added). The Board agreed with the first argument, A.R. at 31-36, and did not rule on the second. Pursuant to 42 U.S.C. § 1395oo(f)(1), the Deputy Administrator for the Centers of Medicare & Medicaid Services then exercised her discretion to review the Board's decision on behalf of the Secretary. Plaintiff asked her to uphold the Board's decision or, in the alternative, to "make a determination" that "the evidence presented . . . in the record" established that most of the time designated by the hospital as "research" was sufficiently associated with the care of particular patients to be includable under the intermediary's theory of the claim. A.R. at 17.

The Deputy Administrator reversed the Board, id. at 2-12, holding that the intermediary properly excluded scholarly research time from the FTE count. Id. at 4-10. She also found that the hospital had failed to document that any research in which student doctors were engaged was "related to patient care." Id. at 10. Accordingly, all 12.6 FTE residents were found to have been properly excluded. Pursuant to 42 U.S.C. § 1395oo(f)(1), plaintiff challenges that decision here.

**STANDARD OF REVIEW**

Under the familiar standard in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 (1984), this Court cannot substitute plaintiff's reading of the statutory scheme for that of the Secretary, but rather must defer to the judgment of the Secretary unless the statutory text "unambiguously forbids" the interpretation or it "exceeds the bounds of the permissible" for some other reason.

Barnhart v. Walton, 535 U.S. 212, 218 (2002). To meet this deferential test, the Secretary's reading of the statute "need not be the only reasonable one," Connecticut Dep't of Income Maint. v. Heckler, 471 U.S. 524, 532 (1985), or even "the best or most natural one by grammatical or other standards." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991). Rather, his construction is entitled to deference so long as it falls "within the bounds of reasonable interpretation." Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999).[10] This deferential test applies with full force when the statutory interpretation at issue appears "in the context of formal adjudication," SEC v. Zandford, 535 U.S. 813, 819-20 (2002), and it applies with particular force where the case involves "a complex and highly technical regulatory program," Wisconsin Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002) (citation omitted), such as Medicare. See, e.g., South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 98 (1st Cir. 2002).

"When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 16 (1965). The task of a court reviewing the Secretary's reading of his own regulations "is not to decide which among several competing interpretations best serves the regulatory purpose," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), but rather "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (citation omitted). And "[t]his broad deference [to the administrative agency] is all the more warranted when, as here, the regulation concerns a 'complex and highly technical regulatory

[10] See Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 21 (2000); Regions Hosp., 522 U.S. at 457; Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 414 (1993); Rust v. Sullivan, 500 U.S. 173, 184 (1991); Sullivan v. Everhart, 494 U.S. 83, 89 (1990).

program.'" Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 76 (1st Cir. 2006) (quoting Thomas Jefferson, 512 U.S. at 512). Factual determinations can be set aside only if they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E), which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Visiting Nurse, 447 F.3d at 72 (citations omitted).

## ARGUMENT

### I. THE SECRETARY PROPERLY EXCLUDED SCHOLARLY RESEARCH FROM THE FTE COUNT BECAUSE RESEARCH IS NOT A COST "SUBJECT TO THE PROSPECTIVE PAYMENT SYSTEM."

In this case, the Secretary reasonably concluded that scholarly research should be excluded from plaintiff's FTE count. As was discussed above, the relevant regulatory language simply provided that, "[i]n order to be counted" in the FTE count, an intern or resident must be "assigned," 42 C.F.R. § 412.105(f)(1)(ii), either to the "portion of the hospital subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), or to the hospital's "outpatient department." 42 C.F.R. § 412.105(f)(1)(ii)(B). Since plaintiff has not documented that any research time at issue here occurred in the outpatient department, the case comes down to a question of what it means to say that a student doctor has been assigned to the "portion of the hospital subject to the prospective payment system." 42 C.F.R. § 412.105(f)(1)(ii)(A). That language can reasonably be read to exclude from the count purely scholarly research that is unrelated to the diagnosis and care of a particular patient.

The word "portion" simply means a "share" or "a part of any whole, either separated from or integrated with it." Random House Webster's Unabridged Dictionary 1507 (2d ed. 2001). The "portion" of the hospital, in turn, "subject to" payment under "the prospective payment system," 42 C.F.R. § 412.104(f)(1)(ii)(A), is that portion wherein, at any given moment, "covered hospital

inpatient services" are "furnished to beneficiaries." 42 C.F.R. § 412.20(a). The PPS system governs payment for the "operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(d)(1)(A) (emphasis added), and, as was discussed earlier, that concept has a long history in the Medicare program. Throughout this history, the term has always been understood to include only those "routine operating costs," 42 U.S.C. § 1395ww(a)(4), that were deemed to be "necessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A) (emphasis added). The cost of research activities, "over and above usual patient care," has never been deemed to fall within the category of hospital expenses that are necessary for the efficient delivery of health services. 42 C.F.R. §§ 413.5(c)(2), 413.90(a). Taken as whole, therefore, the Medicare scheme supports the conclusion that the "portion" of a teaching hospital which is "subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), does not include that portion of the hospital wherein scholarly research is conducted. The time of a resident spent "assigned" to the research area, 42 C.F.R. § 412.105(f)(1)(ii), can fairly be characterized as time that should not be included in the FTE count.[11]

## II. THE SECRETARY DID NOT APPLY THE 2001 REGULATION RETROACTIVELY.

Plaintiffs' contention that the Secretary unlawfully applied the 2001 regulation "retroactively," Complaint at ¶ 34, is puzzling. The challenged decision mentions the 2001 regulation only in a footnote, A.R. 9 n.16, and does not rely on it for the result. In any event,

---

[11] The unpublished decision on which the Board relied, Riverside Methodist Hospital v. Thompson, Case No. C2-02-94, mem. op. (S.D. Ohio July 31, 2003) (A.R. at 485-95), is unpersuasive because it fails to address what it means to say that a "portion" of a hospital is "subject to the prospective payment system." 42 C.F.R. § 412.105(f)(1)(ii)(A). The decision merely assumes that research occurs within that portion and concludes that there is no other reason why scholarly research time should be excluded.

where a regulation "simply clarifying an unsettled or confusing area of the law" does not "change the law but restates what the law according to the agency is and has always been," the settled rule is that "retroactive application of the amended regulation is not prohibited." Treadway v. Gateway Chevrolet Oldsmobile, Inc., 362 F.3d 971, 979 n.7 (7th Cir. 2004) (citation omitted).

## III. THE SECRETARY HAS STATUTORY AUTHORITY TO EXCLUDE RESEARCH TIME FROM THE FTE COUNT.

To the extent that plaintiff is attempting to argue that the authorizing statute in 42 U.S.C. § 1395ww(d)(5)(B) unambiguously mandates the inclusion of research in the FTE count, its claim also lacks merit. The statute, in its entirety, instructs the Secretary to

> provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a) (2) of this section.

Id. By requiring that the new adjustment be computed "in the same manner" as the existing adjustment (used for purposes of the old cost limits), the statute effectively instructs the Secretary to adapt that adjustment for use with subsection (d) hospitals, 42 U.S.C. § 1395ww(d)(5)(B), and gives him discretion to determine how that adaptation should best be accomplished. See Webster's Unabridged Dictionary at 1170 (defining phrase "in a manner" as "so to speak," "after a fashion," or "somewhat"). The statute does not simply command the Secretary to copy verbatim the FTE count used in the cost-limit adjustments. Indeed, he could not do that, since the old count adjusted the rate of increase in cost limits and the new one determines an amount added on to a totally new prospective payment.

As defendant has previously explained, the published IME methodology in effect as of January 1, 1983 could reasonably be read as limiting the FTE count to those residents who were

employed by the hospital to "furnish services to its patients," 45 Fed. Reg. at 21,584, and to exclude research time when the resident was furnishing services to the employer alone. Because the range of interpretation that was permissible under the cost-limit notice was incorporated into the statute, this Court must defer to any subsequent construction that falls within the same range of permissible construction.[12] Because research time could have been permissibly excluded from the FTE count used for purposes of the IME adjustment applied under the cost-limit regime, the exclusion here is "within the bounds of reasonable interpretation." Your Home, 525 U.S. at 453.[13]

The permissibility of the Secretary's interpretation also is supported by subsequent legislative developments. When Congress extended the IME count to the outpatient department in 1986, for instance, it stated that "the Secretary shall continue to count interns and residents assigned to outpatient services of the hospital as part of the calculation of the full-time equivalent number of interns and residents." Consolidated Omnibus Budget Reconciliation Act, Pub. L. No. 99-272, § 9104(a), 100 Stat. at 157 (emphasis added). When Congress amended the statutory scheme again in 1997, it provided that "[e]ffective for discharges occurring on or after October 1, 1997, all the time spent by an intern or resident in patient care activities under an approved

---

[12] See Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740-41 (1996) ("Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows").

[13] In addition, it is difficult to read this provision as "unambiguously" mandating anything, because, as of January 1, 1983, there were no relevant regulations promulgated under 42 U.S.C. § 1395ww(a)(2). There was only a notice published in the Federal Register. It required a threshold act of interpretive discretion, therefore, merely for the Secretary to assume that the notice constituted the "regulations" to which the statute was referring. 47 Fed. Reg. at 43,310.

medical residency training program at an entity in a nonhospital setting shall be counted towards the determination of full-time equivalency if the hospital incurs all, or substantially all, of the costs of the training program in that setting." 42 U.S.C. § 1395ww(d)(5)(B)(iv).[14]

By using the words "services" and "patient care activities," Congress reiterated its understanding that the adjustment for the indirect costs of medical education was designed to compensate teaching hospitals for "the higher costs of providing services" to patients by accounting for the "indirect" costs "attributable to the involvement of residents" in "patient" care, H.R. Conf. Rep. No. 105-217 at 816, as reprinted in 1997 U.S.C.C.A.N. at 437 (emphasis added), and therefore "interns furnishing services at the hospital" should be included in the count. H.R. Conf. Rep. No. 98-861 at 1312, as reprinted in 1984 U.S.C.C.A.N. at 2000 (emphasis added). The negative restatement of that principle is that any time spent by interns and residents when they are not furnishing patient-care services, but rather are doing scholarly research, should not be included in the FTE count. That proposition further supports the conclusion that purely scholarly research can permissibly be excluded.

## IV. PLAINTIFF FAILED TO DEMONSTRATE THAT ANY RESEARCH TIME WAS RELATED TO PATIENT CARE.

The alternative argument made by plaintiff to the Deputy Administrator – that at least some research time "associated with the treatment or diagnosis of particular patients," A.R. at 96 (emphasis added), should have been added back into the count – also is without merit. The hospital's own rotation schedules described the relevant time as occurring in the area of "[r]esearch," A.R. at 10, see A.R. at 512-1020 and it strains credulity to think that more than half

[14] Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4621(b)(2), 111 Stat. 251, 476-77 (1997).

of the time plaintiff itself labeled as "research" was really spent diagnosing and treating patients. The examples of research submitted by the hospital included research that involved animals, id. at 10,[15] laboratory work outside patient areas, id. at 11,[16] and reviews of published literature and surveys of other hospitals. Id. at 61.[17] Research that did involve patients, at least in a generalized way, appeared to be limited to evaluating past care or to clinical trials whose results were not used to treat the participants. Id. at 61-62.[18] The "bottom line" is that the hospital came forward with no evidence of that any of this research was conducted in circumstances "where a resident had questions in his or her mind about a particular diagnosis" or "about what the most efficacious of several treatments might be." Id. at 63; see id. at 240. The activity was therefore not "patient-related" in the legally relevant sense.[19]

Because there was no systematic documentation that any time self-labeled by the hospital as research was, in fact, conducted for purposes of individual patients as opposed to more general scholarly reasons, the Deputy Administrator correctly concluded that plaintiff had not met its

---

[15] See A.R. at 933 ("mostly" chickens and mice), 989 (fetal lambs), 997 (sheep).

[16] A.R. 564 (evaluation of condoms used in Africa), 614 (evaluation of equipment for forensic semen detection), 1006 (cell cultures from Maryland).

[17] See AR. at 613 (survey re exposures to poison), 798 (literature review re bone density).

[18] See A.R. at 526, 528, 775, 789.

[19] Plaintiff's only attempt to document actual hours spent on "patient-related" research consisted of estimates by program directors, who apparently were asked (five years after the fact) to guess about how much research time was "patient-related," using their own subjective ideas of "patient-relatedness" that were not even consistent from one department to the next, let alone carefully limited to the legally-relevant sense of research used for diagnosing and treating particular patients. A.R. at 64-68. As a result, the "patient-relatedness" of the research time was defined so broadly that it included practically anything related to medicine. See id. at 522, 562, 611, 638, 679 688, 710, 715, 773-74, 846-47, 917-18, 931-32, 958-59, 984-85. The reports also contained numerous other incongruities. Id. at 65-68.

burden of providing "sufficient contemporaneous documentation to support its claim that the time spent by residents in research was related to patient care." Id. at 11. If any time designated by the hospital as "research" genuinely involved the diagnosis or treatment of identifiable patients, see id. at 57, the burden was on the hospital to submit the appropriate documentation. Visiting Nurse, 447 F.3d at 77 ("The burden of proof is on the provider seeking reimbursement to demonstrate whether a cost is eligible for reimbursement.") (citing 42 C.F.R. §§ 413.20, 413.24). Failure to do so justifies exclusion of such time from the count.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

ROBERT CLARK CORRENTE
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

/s/
PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov
Attorneys for Defendants

OF COUNSEL:
DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

CLIFFORD PIERCE
Attorney
U.S. Department
of Health and Human Services

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 10, 2006, I filed the foregoing document electronically with the ECF system where it is available for viewing and downloading; and caused it to be served on all counsel of record for plaintiffs, as follows: by the ECF system to registered participants Mitchell Edwards, Esq. and Robert Flanders, Esq., and pursuant to the prior written agreement of the parties, to Lawrence Vernaglia, Esq. by electronic mail addressed to lvernaglia@haslaw.com.

/s/
PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov