**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. Action No. 06-05 ET |
| MICHAEL O. LEAVITT, *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OBJECTION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff hereby objects to Defendants' motion for summary judgment. In support of their objection, Plaintiff relies upon the accompanying memorandum of law.

Respectfully submitted,

RHODE ISLAND HOSPITAL

By its counsel,

/s/Mitchell R. Edwards
Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com

Lawrence W. Vernaglia (admitted *pro hac*)
Foley & Lardner LLP
111 Huntington Ave.
Boston, MA 02199
(617) 342-4079
(617) 342-4001 (facsimile)
lvernaglia@foley.com

Dated: December 27, 2006

CERTIFICATION

I hereby certify that on December 27, 2006 a copy of the foregoing Plaintiff's Objection to Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Mitchell R. Edwards

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 06-05 ET |
| | ) | |
| MICHAEL O. LEAVITT, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Rhode Island Hospital ("RIH") has requested that this Court reverse the Secretary's decision to exclude 12.06 full-time equivalent ("FTE") residents from its indirect medical education ("IME") payment adjustment for fiscal year 1996. The Secretary's decision excluding these FTE residents is based on a mistaken interpretation that the IME statute and regulation in effect for 1996 barred RIH from including resident time spent in scholarly activities, including research, that did not involve direct patient care in calculation of the number of the hospital's FTE residents. As explained in the Memorandum in Support of Plaintiff's Motion for Summary Judgment ("RIH's Memorandum"), this interpretation is not supported by the plain language of the IME statute and regulation applicable in 1996, nor by the legislative history and purpose of the IME payment adjustment. Consequently, the Secretary is not entitled to deference in his interpretation of the applicable regulation.

The Secretary attempts to weave together a complex series of suppositions in support of his contention that resident research time not directly related to patient care is excluded from the IME payment adjustment. A careful reading of the Secretary's arguments, however, shows that neither the plain language of the IME statute and regulation nor the legislative history supports the Secretary's reading. In actuality, the issue presented in this case is straightforward and does not require the convoluted interpretation that the Secretary applies. Reading the governing statute and regulation together with the legislative history, it is indisputable that, while a resident was "assigned to" the hospital, *all* resident time – whether it was spent in scholarly activities or in any other activity required by the approved residency training program – must be included when determining RIH's resident count for purposes of calculating its Medicare IME payment adjustment.

The Supreme Court has clearly held that a court shall not defer to an agency's interpretation of its regulation when "an alternate reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994). It is manifest that Congress intended for the IME payment adjustment to include all resident time, as reflected in the plain language of the statute and the regulation promulgated pursuant to the statute. Consequently, the Secretary's attempt to read into the IME statute and regulation an exclusion for resident research time not directly related to patient care is without merit and is not entitled to deference, much less approval.

## II. ARGUMENT

### A. The Plain Language of the IME Statute Requires the Inclusion of All Resident Activities

#### 1. *The IME Payment Adjustment Is Not a Component of the Prospective Payment System*

The Secretary claims that the IME regulation applicable for fiscal year 1996 "can reasonably be read to exclude from the [IME] count purely scholarly research that is unrelated to the diagnosis and care of a particular patient." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Secretary's Memorandum") at p. 14. Contrary to the Secretary's incorrect reading of the applicable regulation, neither the IME statute nor the regulation in effect for 1996 excluded resident research time, or any other resident activity, from the IME count.

To reach the conclusion that scholarly activities, such as research, not directly related to patient care are excluded from the IME FTE count, the Secretary weaves together a series of assertions in support of his conclusion that the "Medicare scheme" for reimbursement of hospital services does not include "that portion of the hospital wherein scholarly research is conducted."

Secretary's Memorandum at 15. The purpose of the IME payment adjustment, however, is to reimburse teaching hospitals for all the additional costs associated with training and educating medical residents that these hospitals legitimately incur in operating residency programs.

As discussed in RIH's Memorandum, Congress created the IME payment adjustment to compensate teaching hospitals for the unique and often intangible costs they incur in educating and training residents as well as in providing specialized medical services. RIH's Memorandum at p. 11-12 (*citing* H.R. Rep. No. 98-25(I), at 140-41 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 359-60). When Congress devised the hospital inpatient prospective payment system ("PPS") in 1983, it specifically recognized that teaching hospitals incur additional costs that are difficult to identify specifically. As a result, it created the IME payment adjustment to account for these costs. The payment adjustment is an add-on to the PPS formula under which all hospitals are reimbursed for services furnished to Medicare patients. That is, it is a separate Medicare payment created especially for teaching hospitals to account for the increased costs they experience that are associated with their medical residency programs.

The IME payment formula devised by Congress is only intended to estimate the additional teaching hospital costs by acting as a proxy to estimate such costs.[1] To account for the wide range of increased but often unquantifiable costs that teaching hospitals incur, the IME payment adjustment is determined by dividing the number of residents by the number of hospital beds, and multiplying that ratio by two statutorily-assigned factors – one constant and one variable. There is nothing in this congressionally-created formula that excludes resident research time based on the type of activity a resident engages in as part of an approved training program.

---

[1] Even prior to the PPS, Medicare recognized that "a teaching hospital would *not* be required to identify explicitly the costs" to obtain an IME payment adjustment. 45 Fed. Reg. 21,582, 21,584 (April 1, 1980). (Emphasis added.)

In its interpretation of the IME payment adjustment, the Secretary ignores the legislative history – which clearly shows that the adjustment was intended to reimburse teaching hospitals for all their additional costs – and instead attempts to argue that because the PPS system governs the "operating costs of inpatient hospital services," research time should be excluded from the IME adjustment payment. To reach this conclusion, the Secretary relies on the PPS statute and regulations that provide for reimbursement of "routine operating costs" that are "necessary in the efficient delivery of needed health services." Secretary's Memorandum at p. 15*(citing* 42 U.S.C. §§ 1395ww(a)(4); 1395x(v)(1)(A)). According to the Secretary, throughout the history of the Medicare program, the costs of research activities have never been included in hospital expenses that are necessary for the efficient delivery of health services. Secretary's Memorandum at p. 15 (*citing* 42 C.F.R. §§ 413.5(c)(2); 413.90(a)). But it is simply inaccurate to assert that the IME payment adjustment does not include resident research activities. In making this argument, the Secretary attempts to equate the PPS system with the IME payment adjustment when in fact they represent two different payment methodologies.

The Secretary also relies on guidance in the Provider Reimbursement Manual ("PRM") addressing a provider's FTE count. Provider Reimbursement Manual ("PRM") (CMS Pub. 15), Part I, § 2405.3(F)(1). Section 2405.3(F)(1) instructs intermediaries to exclude entire individuals (not time spent by an otherwise includable resident) from a hospital's resident count only if they: (i) are not enrolled in an approved program, (ii) are employed to replace non-physician anesthetists, or (iii) are assigned exclusively to another provider, an exempt unit, non-provider setting, or a drug/alcohol unit prior to 1987. The Secretary points to this provision in support of the argument that research time has to be excluded from the IME adjustment. Secretary's Memorandum at p. 10. Contrary to the Secretary's reading of Section 2405.3(F)(1), however,

this rule only provides limited guidance to assist fiscal intermediaries in identifying individuals who are not part of an approved residency program, and who, therefore, are entirely ineligible to be counted in the resident FTE count. The PRM section speaks to whether or not the "individual" is entirely ineligible to be counted as a "resident" in "an approved teaching program for the purpose of the IME payment adjustment." An individual engaged "exclusively in research" would be such a person. This section, however, does not speak at all to the exclusion of small slices of time of an otherwise properly includable resident on the basis that some of the resident's activities within the approved program constituted research. If anything, the PRM supports RIH's position that resident research time conducted within an approved program is to be included in the calculation of the FTE count.[2]

As discussed above, the IME payment adjustment is an add-on to the PPS system. The IME payment adjustment is not intended to reimburse hospitals for the specifically identifiable costs of training residents. Rather, the direct graduate medical education ("GME") adjustment compensates hospitals for the direct costs associated with training residents, such as salaries and fringe benefits. The IME payment compensates hospitals for the intangible costs teaching hospitals incur to educate and train residents by acting as a proxy or estimate of the additional costs incurred by teaching hospitals. 42 U.S.C. §§ 1395ww(d)(5)(B); *see also* H.R. Rep. No. 98-

[2] The Secretary also suggests that the PRM guidance is supported by internal, non-public audit guidelines ostensibly issued by CMS to the fiscal intermediaries. *See* Secretary's Memorandum at p.10-12 (*citing* Hospital and Skilled Nursing Facility Audit Program (1996); Exhibit A to Secretary's Memorandum). As set forth in RIH's Motion to Strike filed concurrently with its Motion for Summary Judgment, we maintain that there is no basis upon which to include this document as it is not part of the administrative record and was never offered by the government in the administrative proceedings below. Even if the document were to be admitted, the Secretary is mistaken in his attempt to connect this guidance with the PRM guidance. The PRM guidance does not dictate that research not be classified as time worked in the PPS unit of a hospital, but rather, as explained above, only directs that individuals who were not part of an approved residency program be excluded from a hospital's FTE count. Furthermore, for all of the reasons set forth in RIH's Memorandum, the "audit guidelines" are *ultra vires* and contrary to the enabling statute (42 U.S.C. § 1395 *et. seq.*) and regulation (42 C.F.R. § 412.105) at issue here.

25(I) at 140-41. As established by statute, the additional payment does not bear any relation to the type of activity in which a resident is involved. *See* 42 U.S.C. § 1395ww(d)(5)(B)(i).

The Secretary misconstrues the IME payment adjustment to suggest that the calculation excludes reimbursement for the time that residents spend in scholarly activities, such as research, or other scholarly activities not directly related to patient care services. This is simply not correct. The total number of residents in an approved training program is just a variable along with a hospital's number of beds that is used to calculate the adjustment. And the ratio of resident to beds is a proxy used to measure a hospital's "teaching intensity." Thus, it is the level of teaching activity that is measured and then used as a variable in the IME calculation. The specific costs, the actual activities, the nature of services that residents engage in are all immaterial to the IME payment calculation.

2. *All the Residents in Question Were Properly Assigned to a Portion of the Hospital Subject to the Prospective Payment System or to an Outpatient Department*

The Secretary takes his unnecessarily complex argument that Medicare historically has not paid for research time in the context of the PPS system one step further by then arguing that time spent by residents in scholarly activities unrelated to direct patient care is not spent in a "portion of the hospital subject to the prospective payment system." Secretary's Memorandum at p. 15. As explained by the Secretary, the "time of a resident spent 'assigned' to the research area . . . can fairly be characterized as time that should not be included in the FTE count." *Id.* This new argument, which was never made before in the administrative proceedings, is without merit.

A plain reading of the IME statute and regulation applicable in 1996 clearly shows that the Secretary's argument misses the mark. The IME payment adjustment is intended to compensate teaching hospitals for all the activities of residents in an approved training program



#769419-P-v3

and assigned to either the PPS portion or to an outpatient department of the hospital. Neither the statute nor the regulation distinguishes between the type of activities performed by a resident during a training program. The formula used to calculate the IME adjustment simply uses the number of residents in a training program as a variable in the calculation that is designed to compensate teaching hospitals for their increased costs based on the size of their training program. Consequently, the specific activity in which a resident engages is immaterial to the IME calculation. Therefore, it is inaccurate and unfair to characterize the IME payment adjustment as excluding resident research time not directly related to patient care activities.

A reading of the regulatory history further explains why the Secretary deemed it necessary to measure a resident's FTE status by which portion of the hospital the resident was assigned to. The historical reason for this is that when the PPS system was first created, several inpatient units of acute care hospitals were excluded from the PPS, namely psychiatric and rehabilitation units.[3] As explained by the Secretary:

> [t]he teaching adjustment does not apply to any hospital not paid under the prospective payment system, *such as those hospitals or distinct part psychiatric and rehabilitation units that are paid on a reasonable cost basis, since the payments to those facilities already include the indirect costs of medical education*. Therefore, the number of beds in an excluded psychiatric and rehabilitation unit, as well as interns and residents assigned to those units, may not be included in calculating the ratio of interns and residents to beds.

48 Fed. Reg. 39,752, 39,778 (Sept. 1, 1983). (Emphasis added.)

In other words, the payment methodology for the excluded hospital units already takes into account the indirect costs of medical education. Thus, the adoption of the IME regulation shows that the term "portion" refers to geographic designations or to "distinct part" units of

[3] As of today, both inpatient psychiatric and rehabilitation units are now subject to a PPS system.

hospitals that are paid on a cost basis; but it does not refer to "services" or "activities" as the Secretary would read the regulation. Consistent with the holding in the *Alhambra Hospital* (see below), this Court should adopt a geographic definition of the terms "areas" and "portions." To follow the Secretary's interpretation would thwart the entire purpose of the IME payment adjustment by rendering meaningless the underlying regulation.

In support of his reading of the term "portion," the Secretary relies on the dictionary definition, which defines a portion as a "share" or "a part of any whole." Secretary's Memorandum at p. 14 (*citing Random House Webster's Unabridged Dictionary*, 1507 (2d ed. 2001)). RIH does not dispute this definition of portion, but takes issue with the Secretary's application of this definition to the IME regulation. The IME regulation sets forth only two criteria for inclusion of a resident FTE in a hospital's IME count: (i) the resident must be enrolled in an approved residency program; and (ii) the resident must be assigned to either the PPS "portion" of the hospital or to an outpatient department. The Secretary seems to confuse the geographic location within the hospital to which the residents have been assigned with their type of activity while in such a location. Simply because a resident must be assigned to a portion of the hospital subject to the PPS does not mean that the PPS payment rules must limit the type of activity that can be included in the IME calculation so as to exclude research time unrelated to direct patient care services.

The Ninth Circuit addressed this very issue in a case in which it considered the term "areas" with respect to the scope of services "subject to the prospective payment system" in a nearly identical regulation. *Alhambra Hospital v. Thompson*, 259 F.3d 1071, 1074 (9th Circ. 2001) ("*Alhambra Hospital*"). In *Alhambra Hospital*, the court considered the regulation at 42 C.F.R. § 412.106(a)(1)(ii) which provides that the "[t]he number of patient days includes only

those days attributable to *areas* of the hospital that are subject to the prospective payment system and excludes all others." *Id*.. (Emphasis in original.). This regulation determines the number of days a disproportionate share hospital is entitled to include in the calculation which in turn entitles such hospitals to an additional Medicare payment.[4] The government attempted to exclude from these hospitals' total Medicaid patient days, those days spent by Medicaid patients in "sub-acute" care units of hospitals.

The court in *Alhambra Hospital* found little merit to the government's position that sub-acute units are not subject to PPS, concluding that if it "were to adopt the Secretary's interpretation, the entire framework" established in the PPS regulations "would be meaningless." *Alhambra Hospital*, 259 F.3d at 1075. In particular, the court rejected the government's attempt to tie a particular geographic area of a hospital to the nature of patient services referenced here. As explained by the court, the regulation in question "refers to '*areas* of the hospital that are subject to the prospective payment system.'" It does not refer to "*services* of the hospital that are subject to the prospective payment system" or to "*patients* of the hospital that are subject to the prospective payment system. . . ." *Id*. (*citing* 42 C.F.R. § 412.106(a)(1)(ii)). (Emphasis in original.)

Substituting the word "portion" for "areas," the court's reasoning is precisely the rationale that should be applied here. The "assigned to" requirement in the IME regulation reflects the requirement that residents must be assigned to a particular portion of the hospital, so that residents who are in a non-PPS portion of the hospital (in this case, RIH's cost-reimbursed psychiatric unit) are not counted for purposes of the hospital's IME count. In the Secretary's

---

[4] A disproportionate share hospital is a hospital that serves a significantly number of low income patients. *See* 42 U.S.C. § 1395ww(d)(5)(F). Like teaching hospitals, these hospitals are entitled to a hospital-specific adjustment to their regular PPS payment.

judgment, this was the most appropriate means to exclude from the IME count those residents who did not provide services in a PPS portion of the hospital. The assigned geographic location of a particular resident within a hospital, however, does not then mean that certain activities performed by the resident while he or she is assigned there are to be excluded from the IME count. Indeed, this would be contrary to the prevailing purpose of the IME adjustment, which is to compensate teaching hospitals for their residents' FTE status "based on the total time necessary to fill a residency slot." 42 C.F.R. § 412.105(f)(iii).[5]

B. The Secretary Retroactively Applied the 2001 IME Regulation to RIH's 1996 Cost Report Year

The Secretary spends little time addressing retroactive application of the 2001 IME regulation (the "2001 Rule") except to note that the CMS Administrator's decision only references the 2001 Rule in a footnote but even so the Secretary would be entitled to apply the 2001 Rule retroactively since it clarifies "an unsettled or confusing area of the law." Secretary's Memorandum at pp. 15-16 (*citing Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 979 n.7 (7th Cir. 2004) (citation omitted)).

Although not explicitly discussed in the CMS Administrator's decision, it is clear from the reasoning contained in that decision that this case amounts to nothing more than an attempt by the Secretary to retroactively apply the 2001 Rule to RIH's 1996 cost report year. As discussed in RIH's Memorandum (and as held by the PRRB and the *Riverside* court), the 2001 Rule was not a "clarification" of supposedly historical Medicare policy but rather it is a rule change that squarely violates the rulemaking provisions of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(4).

[5] All references to 42 C.F.R. § 412.105 are to the 1996 version of the Code of Federal Regulations, unless otherwise indicated.

Prior to 2001, there was nothing in the IME statute, regulation, Federal Register notices, or in any other Medicare guidance that purported to exclude resident research time not directly related to patient care from the IME payment adjustment.[6] The Secretary's disingenuous transparent argument that this case does not involve a retroactive application of the 2001 Rule – one that specifically excludes resident research time not related to patient care – but rather represents application of long-standing Medicare policy is not persuasive. Retroactive application of the 2001 Rule runs afoul of the APA and this court should, as the court did in *Riverside*, find that the 2001 Rule cannot be applied retroactively. *See Riverside Methodist Hospital v. Thompson*, 2003 U.S. Dist. LEXIS 15163 at *9, 11-12 (S.D. Ohio July 31, 2003).

C. <u>The Secretary Lacks Statutory Authority to Exclude Resident Activities – Including Research Not Directly Related to Patient Care – from the IME Payment Adjustment</u>

It follows then that the Secretary's contention that he has statutory authority to exclude resident research time not directly related to patient care from the IME FTE count is similarly without merit. Secretary's Memorandum at pp. 16-18. This argument is really no more than a variation on the Secretary's mistaken belief that research costs historically have been excluded from the Medicare reimbursement scheme.

The IME statute directs the Secretary to make an additional payment for the indirect costs of medical education "in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983)." 42 U.S.C. § 1395ww(d)(5)(B). Relying again on a dictionary definition, the Secretary points to the phrase "in a manner" to

[6] In fact, as discussed in the RIH's Memorandum, Medicare policy issued in 1999 actually showed that resident research should be counted for IME payment purposes so long as the research was part of an approved program and the majority of a resident's time was otherwise spent in patient care activities. RIH's Memorandum at p. 18.

argue that this provides a basis upon which to determine how that adaptation should be made. Secretary's Memorandum at p. 16 (defining phrase "in a manner" as "so to speak," "after a fashion," or "somewhat") (*citing Webster's Unabridged Dictionary* at 1170). Again, RIH does not take issue with the dictionary definition of this phrase but submits that the Secretary *omits* a critical word, namely the word "*same*." Section 1395ww(d)(5)(B) specifically instructs the Secretary to compute the IME payment "in the *same* manner" as the regulations in effect as of January 1, 1983. According to *Merriam-Webster's Collegiate Dictionary* from 1996, the word "same" is defined as "something identical with or similar to another." *Merriam-Webster's Collegiate Dictionary* (10th Ed.) at p. 1034. Thus, the word "same" means "identical," meaning the Secretary was required to adopt a methodology under the IME statute that was identical to the one in place prior to 1983.

The reference to January 1, 1983 refers to the IME regulations that were promulgated pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248 (1982).[7] Although somewhat confusing because the TEFRA IME methodology was contained in a Federal Register notice – as opposed to a regulation – this guidance provided that the number of a hospital's FTE residents would be computed as the sum of residents employed for 35 hours or more per week and one half of the total number of residents working less than 35 hours per week.[8] 47 Fed. Reg. 43,296, 43,310 (Sept. 30, 1982). The computation only excluded

---

[7] TEFRA was enacted in 1982 prior to the PPS as a means to control Medicare costs under the cost-based reimbursement system by placing limits, in the form of a ceiling, on allowable costs per case. Once Congress determined that the TEFRA limits did little to hold down Medicare costs, it enacted the PPS system the following year in 1983.

[8] The Secretary contends there was no IME regulation as of January 1, 1983 but only a notice published in the Federal Register. Secretary's Memorandum at p. 17, n. 12. This is technically not correct. There was a regulation promulgated at 42 C.F.R. § 405.421 which provided that a provider's allowable cost may include its net cost of approved educational activities, which included both direct and indirect costs of educational activities. As noted above, however, the IME formula was set forth in a Federal Register notice.

residents who were not in an approved teaching program. The methodology, however, made no distinction between the type of activities to be included in the payment adjustment, only that it was intended to account for the additional costs associated with operation of medical training programs.

Notably, when the Secretary first adopted this methodology in 1980, it identified a "high degree of correlation between a hospital's level of general routine operating costs and the extent of its *teaching activity*." 45 Fed. Reg. 21,582, 21,584 (April 1, 1980). (Emphasis added.) The Secretary actually cites to this Federal Register notice supposedly in support of his argument that the IME methodology in effect as of January 1, 1983 could "reasonably be read" as excluding residents who engaged in research activities not directly related to patient care. Secretary's Memorandum at p. 16-17. The Secretary takes one phrase out of context, however, specifically the phrase "furnish services to its patients," to make this argument. A full reading of the provision shows that the phrase was used in relation to the higher costs incurred by teaching hospitals:

> Generally, hospitals with approved graduate medical education programs incur higher per diem operating costs than non-teaching hospitals of similar bed size and geographic location. Among teaching hospitals of similar size and location, costs increase in direct proportion to *the number of interns and residents (in approved programs) the hospital employs to furnish services to its patients.*

45 Fed. Reg. at 21584. (Emphasis added.)

When read in its entirety, the provision shows that the Secretary recognized the additional costs incurred by teaching hospitals based on the *number* of residents employed by the hospital, not based on the *type* of activities residents engaged in while participating in an approved teaching program, part of which "employs [residents] to furnish services to its patients." Thus, the IME statute dictates that the payment methodology employed under the PPS system be the

"same" as provided for in the TEFRA methodology. The Secretary did not have to follow the *results* of the TEFRA methodology but, clearly, Congress directed that he use the same *methodology* which – again – included all resident activities.

The Secretary also relies on several legislative developments to bolster his argument, none of which advance his position. First, the Secretary points to the extension of the IME count in 1986 to the outpatient department, pointing to the fact that legislation directed that the Secretary count interns and residents assigned to "outpatient services" as part of the FTE count. Secretary's Memorandum at p. 17. But the use of the word "services" in this context does not suggest that Congress intended the IME count to exclude resident research time that was not directly related to patient care. Rather, this mirrors the geographic requirement that a resident be assigned to the PPS portion of a hospital. Moreover, the Secretary ignores the fact, as discussed in RIH's Memorandum, that in 1986, Congress rejected an attempt by the Secretary to exclude resident time not subject to outpatient services from the IME adjustment, specifically directing the Secretary to include such time. *See* RIH's Memorandum at p. 18, n.12.

Next, the Secretary relies on the legislative history related to the non-hospital GME rules. Secretary's Memorandum at p. 18. Although most physician training takes place in hospitals, the Secretary is authorized to pay the *direct* costs of GME furnished at certain non-hospital sites (*i.e.*, offsite) to encourage training in such settings. *See* 42 U.S.C. § 1395ww(k). Time spent by a resident in patient care activities under an approved medical residency training program in a non-hospital setting is counted towards the determination of the hospital's number of FTE residents if the hospital incurs all, or substantially all, of the costs for the training program in the non-hospital setting. When Congress created this statutory provision, it was to encourage physician training in clinics, nursing homes, and other such non-hospital settings. As of 1997,

teaching hospitals can claim an FTE resident who trains in a non-hospital setting for purposes of both the GME and IME payment adjustment. 42 C.F.R. §§ 413.78(d); 412.105(f)(1)(ii)(C).

The Secretary asserts that by using the words "services" and "patient care activities" in the legislative history, Congress "reiterated its understanding that the adjustment for the indirect costs of medical education was designed to compensate" teaching hospitals for direct patient care activities. Secretary's Memorandum at p. 18. But this is an unhelpful comparison. The non-hospital payment adjustment is intended to recognize the costs incurred for training residents in offsite residency programs for purposes of both the GME and IME payment adjustment. Because such training takes place in an offsite location from the main teaching hospital, the teaching hospital would only incur costs related to the residents' patient care activities because the actual training would not take place in the teaching hospitals. Consequently, it was entirely reasonable for Congress to limit GME and IME payments for non-hospital training programs to patient care activities. Indeed, Congress could have similarly limited the IME payment adjustment but significantly it chose not to do so.

In relying on these legislative provisions, the Secretary essentially ignores the substantial legislative and regulatory history directly related to the IME payment adjustment. As discussed in RIH's Memorandum, it is clear that the overriding purpose of the IME payment adjustment is to compensate teaching hospitals for the additional, unquantifiable costs associated with educating and training residents.

D. RIH Demonstrated that 7.49 FTE Residents Were Engaged in Research Activities Directly Related to Patient Care.

Lastly, the Secretary maintains that RIH has failed to demonstrate that the research time associated with 7.49 FTEs was directly related to patient care. Secretary's Memorandum at pp. 18-19. As a preliminary matter, this is an alternative argument, which RIH only makes in the

event that the Court does not rule in its favor on the primary issue of whether the 12.06 FTEs are to be included in the hospital's IME adjustment for fiscal year 1996. Further, RIH submits that this argument is not ripe for summary judgment as there appears to be several factual issues in dispute and, therefore, requests that this Court reserve ruling on this issue as part of RIH's request for summary judgment.

Nonetheless, RIH will respond to the Secretary's argument, which is not supported by the administrative record. The Secretary attacks the evidence submitted by RIH concluding that none of the patient-related activity performed by the 7.49 FTEs was patient related "in the legally relevant sense." Secretary's Memorandum at p. 19. Beyond relying on selected statements taken out of context in the administrative record, the Secretary does not engage in a meaningful analysis of the documentation that RIH submitted or the testimony presented at the in-person PRRB hearing. This detailed documentation included a study of each resident in question performed by an outside consulting firm to show the percentage of resident research time related to direct patient care. *See* A.R. at 2082-2701.

RIH also presented testimony from the Program Director of each residency program that showed the portion of each resident's research time that was directly related to patient care. *See* A.R. at 2097-98; 2170-71; 2193-94; 2253; 2278-2279; 2348-2349; 2372-2373; 2436-2437; 2515-2516; 2593-2594; 2605-2606; 2633-2635; and 2659-2660. It is undisputed that the Program Directors are the best source of information regarding the activities of the nearly 100 residents who comprised the 7.49 FTEs. A.R. at 166; 2082. In many instances, the Program Director could make a determination that the research time was related to patient care because he or she personally supervised the resident. A.R. at 198. Moreover, only research identified by the Program Directors as relating to direct patient care was included in the 7.49 FTE count. *See* A.R.

at 2097-98; 2170-71; 2193-94; 2253; 2278-2279; 2348-2349; 2372-2373; 2436-2437; 2515-2516; 2593-2594; 2605-2606; 2633-2635; and 2659-2660. In addition to written statements from the Program Directors, RIH submitted house tracking sheets that show how much of the resident research at issue was clinical research and, thus, related to direct patient care as well as time devoted to research publications, namely articles, abstracts, and other published studies, that arose from several of the resident's research activities. A.R. at 2082-2701.

The Secretary largely disregards this substantial evidence to conclude that none of the 7.49 FTEs engaged in research directly related to patient care. We maintain that this evidence more than demonstrates that the research activities of the 7.49 FTEs in question were related to direct patient care and, thus, should be included in RIH's IME count for 1996. As noted above, however, we ask that the Court refrain from ruling on this issue given the factual disputes that remain at issue.

## III. CONCLUSION

Based on the foregoing, the Secretary is not entitled to deference in his interpretation of the IME statute and regulation to exclude resident research time not directly related to patient care. The Secretary misconstrues the applicable statute and regulation to arrive at the erroneous exclusion that the Medicare reimbursement scheme provides a framework upon which to exclude resident research time that was unrelated to direct patient care services from the IME payment adjustment. A plain reading of the IME statute and regulation in effect for 1996 as well as the legislative history compels the legal conclusion that the FTE part of the IME payment adjustment includes all resident activities, including scholarly activities, such as research, that are not directly related to patient care.

Congress created the IME payment adjustment as a proxy to reimburse teaching hospitals for the increased costs associated with training and educating residents. Because these increased

costs are not quantifiable, Congress used the hospital's "teaching intensity" – the ratio of residents to beds – as a proxy for actual IME costs. Congress never intended that the IME adjustment would be calculated based only on the patient care activities that a resident was required to engage in order to participate in an approved residency program. This is reflected in the plain language of the IME statute. Further, the Secretary's regulation promulgated pursuant to this statutory authority in effect for 1996 only required that a resident be in an approved program and assigned to the PPS portion of the hospital or to an outpatient department.

It is undisputed that the 12.06 FTEs at issue were enrolled in an approved residency program. It also undisputed, as specifically found by the PRRB, that the residents met the "assigned to" requirement. A.R. at 35. Thus, as a matter of law, there is no legal basis upon which to exclude the 12.06 residents from RIH's IME count for fiscal year 1996.

For all of these reasons, the Court should grant RIH's motion for summary judgment and deny the Secretary's motion for summary judgment.

Respectfully submitted,

RHODE ISLAND HOSPITAL

By its counsel,

/s/Mitchell R. Edwards
Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com

Lawrence W. Vernaglia (admitted *pro hac*)
Foley & Lardner LLP
111 Huntington Ave.
Boston, MA 02199
(617) 342-4079
(617) 342-4001 (facsimile)
lvernaglia@foley.com

Dated: December 27, 2006

**CERTIFICATION**

I hereby certify that on December 27, 2006, a copy of the foregoing Opposition to Defendants' Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Mitchell R. Edwards

Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com