IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, *et al.*,<br><br>Defendants. | ) | Civ. Action No. 06-05 ET |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff hereby moves for summary judgment. In support of its motion, Plaintiff relies upon the accompanying memorandum of law, statement of undisputed facts, and the administrative record.

Respectfully submitted,

RHODE ISLAND HOSPITAL

By its counsel,

/s/Mitchell R. Edwards
Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com

Lawrence W. Vernaglia (admitted *pro hac*)
Foley & Lardner LLP
111 Huntington Ave.
Boston, MA 02199
(617) 342-4079
(617) 342-4001 (facsimile)
lvernaglia@foley.com

Dated: December 27, 2006

**CERTIFICATION**

I hereby certify that on December 27, 2006 a copy of the foregoing Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Mitchell R. Edwards______

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 06-05 ET |
| | ) | |
| MICHAEL O. LEAVITT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case involves a dispute over Medicare payments due to Rhode Island Hospital ("RIH"). The issue is whether the Centers for Medicare & Medicaid Services ("CMS") Administrator[1] properly excluded certain time spent by residents, interns, and fellows (collectively "residents") in scholarly activities from the 1996 payment adjustment that RIH received from Medicare for its indirect medical education ("IME") costs during that period. After a hearing, the Provider Reimbursement Review Board ("PRRB"), which is the independent, statutorily-created entity for resolving Medicare payment disputes, agreed with RIH that the research time in question should have been included in the hospital's IME payment adjustment. The CMS Administrator, however, disagreed and reversed the PRRB decision. RIH has appealed the CMS Administrator's decision to this Court and now seeks summary judgment from the Court on several grounds.

The plaintiff, RIH, is a 719-bed not-for-profit acute care hospital and academic medical center located in Providence, Rhode Island. In affiliation with Brown University Medical School, RIH operates a large graduate medical education program that employs approximately 500 medical residents in 42 specialties and sub-specialty programs. RIH participates in the federal Medicare program, which provides health insurance benefits to the elderly and disabled. In recognition of the differences in operating costs between teaching and non-teaching hospitals, the Medicare program includes a special payment adjustment in its reimbursement methodology for teaching hospitals. Congress created this payment adjustment, known as the IME adjustment, to act as a proxy to account for a number of factors that may legitimately increase the costs that teaching hospitals incur in educating and training residents.

---

[1] The CMS Administrator is the delegate of the defendant Secretary of Health and Human Services Department ("Secretary").

The plain language of the IME statute and the applicable regulation as well as the historical purpose of the IME payment adjustment show why, as a matter of law, all residents who were enrolled in an approved graduate medical education program and who were assigned to those portions of RIH that were subject to the Medicare reimbursement system in question were properly included in RIH's IME count of residents for fiscal year 1996. Contrary to law, the CMS Administrator has retroactively applied a 2001 regulation to the RIH's 1996 IME payment adjustment in violation of the Administrative Procedure Act. In 2001, CMS amended its existing regulation to exclude for the first time non-patient care research activities from the IME payment adjustment. But in doing so, CMS asserted that this new requirement was only intended to "reiterate [the agency's] longstanding policy regarding time that resident spend in research." *See* 66 Fed. Reg. 39827, 39896-97 (Aug. 1, 2001).

Nothing in the statute, regulation, or Federal Register issuances prior to 2001, however, suggested, directly or even indirectly, that resident research time which was not directly related to patient care had to be excluded from a hospital's resident count for IME purposes. On the contrary, the evidence in the record shows that CMS's then-existing policy supported the inclusion of such time in calculating the IME payment adjustment.

Significantly, the federal district court in the Southern District of Ohio has addressed this very issue and rejected the government's arguments. In *Riverside Methodist Hospital v. Thompson*, No. C2-02-94, 2003 U.S. Dist. LEXIS 15163 (S.D. Ohio July 31, 2003) ("*Riverside*"), the court held that: (1) the Secretary had to comply with the necessary procedures for amending regulations if he wanted to include a new requirement excluding certain time from the IME payment adjustment (i.e., the Secretary cannot apply the new 2001 rule governing resident research time retroactively); and (2) even after the 2001 rule was enacted, the Secretary

could not exclude resident time spent on activities other than direct patient care from the IME payment adjustment. *See Riverside*, 2003 U.S. Dist. LEXIS 15163 at * 17-19, 20, and 37. This Court should following the holding and reasoning in *Riverside*.

For these reasons, the Court should grant RIH's motion for summary judgment.

## II. STATUTORY AND REGULATORY BACKGROUND

### A. Medicare Indirect Medical Education Payments

Title XVIII of the Social Security Act, Pub. L. No. 89-97, 79 Stat. 281 (1965) (codified as amended at 42 U.S.C. § 1395 *et seq.*) sets forth a federally funded health insurance program for the elderly and disabled, known as Medicare. The program is administered by the Secretary through CMS. The Medicare statute provides for payment on a prospective basis to hospitals for providing inpatient services. 42 U.S.C. § 1395d. Under this prospective payment system ("PPS"), hospitals are reimbursed on the basis of prospectively determined national and regional rates that are keyed to the patient's diagnosis at discharge.

Since the inception of the Medicare program, Congress has recognized the importance of teaching hospitals and the costs associated with training and educating residents. When Congress established the PPS system for hospitals in 1983, it acknowledged that the system should include the costs incurred by teaching hospitals in operating residency training programs.[2] The legislative history shows that Congress had "serious doubts (explicitly acknowledged by the Secretary in his recent report to the Congress on prospective payment system) about the ability of the [prospective payment system] to account fully for factors such as . . . the *additional costs*

[2] In 1983, Congress amended the Medicare statute to provide for the payment of inpatient hospital services on a prospective basis. 42 U.S.C. § 1395ww(d). Previously, Medicare reimbursed hospitals on the basis of "customary charges" or the "reasonable cost" of services. 42 U.S.C. § 1395f(b)(1).

*associated with the teaching of residents*."[3] H.R. Rep. No. 98-25(I), at 140-41 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 359-60 (emphasis added); *see also* S. Rep. No. 98-23, 52-53 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 192-93.

Based on these concerns, Congress determined that teaching hospitals are entitled to an additional payment so that the Medicare program pays its fair share of the costs that teaching hospitals incur to train physicians. Because the approved teaching programs all require residents to engage in scholarly activities, teaching hospitals are required to incur these program costs as part of training their residents. Under Medicare, teaching hospitals are entitled to two types of graduate medical education ("GME") payments: (1) the direct GME payment which compensates hospitals for the direct costs associated with training residents, such as salaries and fringe benefits; and (2) the IME payment which compensates hospitals for the intangible and indirect costs associated with training residents. 42 U.S.C. §§ 1395ww(d)(5)(B)(h); *see also* H.R. Rep. No. 98-25(I) at 140-41. The dispute here involves the calculation of the IME payment adjustment derived from RIH's residents' time in scholarly activities, including research, that are conducted during the course of their approved medical education programs at the hospital.

The additional IME payment consists of a percentage add-on to the regular PPS payment. 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105.[4] By law, the amount of the add-on depends on the ratio of the number of the hospital's interns and residents to the number of its beds. Thus, there are two variables in the calculation of a hospital's IME adjustment: (i) the number of beds and (ii) the number of interns and residents. When Congress created the IME payment

[3] The legislative history also shows Congress recognized that teaching hospitals treat an inordinately high number of severely ill patients whose "severity of illness" requires "the specialized services and treatment programs" of teaching institutions. H.R. Rep. No. 98-25(I), at 140-41

[4] All references to 42 C.F.R. § 412.105 are to the 1996 version of the Code of Federal Regulations, unless otherwise indicated.

adjustment, it recognized that the ratio was "only a proxy to account for a number of factors which may legitimately increase costs in teaching institutions."

Congress also directed the Secretary to use a hospital's "teaching intensity" – the ratio of its full-time equivalent ("FTE") residents to hospital beds as a proxy for actual IME costs. H.R. Rep. No. 98-25(I), at 140-41. A hospital's "IME Adjustment Factor" is calculated as follows: [{1 + (R/B)}n-1] x C = "IME Adjustment Factor."[5] The IME reimbursement amount is equal to the "IME Adjustment Factor" multiplied by the hospital's total PPS payments for the applicable fiscal year. 42 U.S.C. § 1395ww(d)(5)(B)(ii). The add-on is paid regardless of whether any particular Medicare patient was treated by a resident in the hospital.

Specifically at issue here is the proper method for determining the variable "R" – the number of resident FTEs. The question presented is whether the statute and regulation in effect for fiscal year 1996 permitted the Secretary to exclude from the total number of residents ("R") the time that its residents spent participating in scholarly activities, including research, that were a required part of their training program but not necessarily directly related to caring for a particular patient.

B. The IME Regulation

The Secretary adopted regulations implementing the IME statute, specifically the regulation at 42 C.F.R. § 412.105. For the year at issue in this case, 1996, the regulation provided as follows with respect to the variable "R":

> (1) For cost reporting periods beginning on or after July 1, 1991, the count of full-time equivalent residents for the purpose of determining a hospital's IME adjustment is determined as follows: (i) The resident must be enrolled in an approved teaching program . . . (ii) In order to be counted, the resident must be

[5] Where: R = Number of Residents Assigned to the Hospital; B = Number of the Hospital's Beds; N = .405 (Measurement Factor for Teaching Activity); C = Statutory Adjustment Factor (a factor Congress establishes annually to modify the IME payments nationally).

> assigned to one of the following areas: (A)The portion of the hospital subject to subject to the prospective payment system. (B)The outpatient department of the hospital.

42 C.F.R. § 412.105(g)(1)(i)-(ii). Thus, as long as a resident was enrolled in an approved teaching program and assigned to an area of the hospital that was subject to the PPS system or to an outpatient department, the resident had to be included in the count of FTE residents to determine the hospital's IME payment. In addition, "full time equivalent status is *based on the total time necessary to fill a residency slot,*" and not solely on the time that residents actually spend in direct patient-care activities (or any other activities). 42 C.F.R. § 412.105(g)(1)(iii). (Emphasis added.)

To include a resident in the FTE count, a hospital was required to furnish the following information to its fiscal intermediary: (i) a listing of all its residents by specialty; (ii) the residents' names and social security numbers; (iii) the dates the residents were "assigned to" the hospital; and (iv) the proportion of total time necessary to fill a residency slot that a resident is assigned to in one of the areas listed in 42 C.F.R. § 412.105(g)(1)(ii). 42 C.F.R. § 412.105(g)(2).

### C. The 2001 IME Rule

In 2001, five years after the events in this case took place, CMS adopted a rule change to the IME regulation. For the first time, CMS created a rule that attempted to exclude residents' various scholarly activities, such as research, from the FTE count. The amended rule states that "[t]he time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient is not countable." (the "2001 Rule"). 42 C.F.R. § 412.105(f)(1)(iii)(B) (2001).[6] According to the Preamble to the final rule adding this provision, the purpose of the 2001 Rule was to "clarify" that "the time that residents devote specifically to performing

[6] The IME regulation provision related to the counting of residents is now designated at 42 C.F.R. § 412.105(f).

research that is not related to delivering patient care, whether it occurs in the hospital complex or in non-hospital settings, may not be counted for IME purposes." 66 Fed. Reg. 39,828, 39,897-39,898 (Aug. 1, 2001). CMS says that it created the 2001 Rule to address apparent "confusion" in the provider community. *Id.* In the Secretary's 2001 view, a resident's research time had to be spent in direct patient care activities for it to be counted for IME purposes. Under the Secretary's new rule, research and other scholarly time spent by a resident (such as attendance at lectures and meetings) that was not directly related to a specific patient's care could not be included in a hospital's FTE IME count, even if, as in this case, such activities were a required element of the resident's training program.

## III. STATEMENT OF FACTS AND PRIOR PROCEEDINGS

The Accreditation Council for Graduate Medical Education ("ACGME"), one of the organizations responsible for the approval of post-graduate medical training programs, has accredited RIH's graduate medical education programs. Complaint ("Compl.") and Answer ¶ 22; Administrative Record ("A.R.") at 163-64. Pursuant to the ACGME requirements, all residents at issue who were enrolled in an approved training program at RIH in fiscal year 1996 were required to participate in scholarly activities, which include research. Compl. and Answer ¶ 22; A.R. at 170; 1842-1945. While participating in their research-related activities, residents continued to participate in other educational and training activities, *including the provision of direct patient-care services*, participation in grand rounds with a teaching physician and other residents, attendance at lectures and journal clubs and other such activities. Compl. and Answer ¶ 22; A.R. at 170.

RIH's fiscal intermediary, Blue Cross Blue Shield of Rhode Island[7] (the "Intermediary") excluded 12.06 FTEs from the hospital's resident FTE count for fiscal year 1996 on the ground that research time could not be included in the IME payment adjustment. Compl. and Answer ¶ 23; A.R. at 243-44, 2079-80. The basis for the Intermediary's audit adjustment was its belief that *all* resident research time was excludable under the Medicare rules. A.R. at 236-37, 243. The Intermediary's exclusion of research time from RIH's FTE count resulted in an adjustment in its FTE count of 12.06 FTEs and a reimbursement disallowance of $1,040,762. Compl. and Answer ¶ 24.

By letter dated March 23, 1998, RIH timely appealed the Intermediary's adjustments to the PRRB, an independent, external adjudicatory board. Compl. and Answer ¶ 25; A.R. at 2849-50. Following extensive briefing and a hearing with expert testimony held on December 17, 2004, the PRRB issued a decision dated September 13, 2005. A.R. at 31-36. The PRRB held that the regulation in effect for fiscal year 1996 did not exclude the challenged research time from RIH's FTE count. A.R. at 34. In addition, the PRRB found that the 2001 Rule excluding research time not directly related to patient care did not apply retroactively to costs arising in fiscal year 1996. A.R. at 35.

The CMS Administrator reversed the PRRB's decision on November 16, 2005. A.R. at 2-12. The Administrator concluded that resident research hours that were not related to providing direct patient care had to be excluded from RIH's FTE count for IME purposes. A.R. at 10. The Administrator asserted that such research time had to be excluded from the IME payment adjustment because "[u]nder both the reasonable cost and IPPS [inpatient prospective payment system] methodology, only the indirect costs of teaching programs relating to patient

[7] Blue Cross Blue Shield of Rhode Island is now known as Arkansas Blue Cross and Blue Shield.

care (and operating costs) is[sic] intended to be reimbursed by Medicare." A.R. at 10. Consequently, the Administrator held that resident research time not directly related to patient care "must be excluded from the IME FTE count." A.R. at 10. This erroneous conclusion, we submit, ignores both the plain language of the IME statute and the regulation in effect in 1996; moreover, because it subverts the legislative purpose of the IME payment adjustment, it was arbitrary, capricious and an abuse of discretion.

The Administrator also introduced a new argument, based on alleged facts that the PRRB found did not exist; namely, the conclusion that the residents in question were not assigned to areas of the hospital subject to the PPS or to an outpatient department of the hospital. A.R. at 10.

On January 6, 2006, RIH timely filed this action seeking reversal of the Administrator's final decision, and an order requiring the Intermediary to include an additional 12.06 FTEs of resident research time in the hospital's fiscal year 1996 IME FTE count. RIH now moves for summary judgment on the grounds that, as a matter of law, the Administrator erred in excluding the 12.06 FTEs from RIH's resident count for fiscal year 1996 for IME payment purposes.

## IV. STANDARD OF REVIEW

Jurisdiction over this action is based on 42 U.S.C. § 1395oo(f)(1), which provides for judicial review of final Medicare provider reimbursement decisions under the terms of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994). The APA standard of review, 5 U.S.C. § 706(2)(A) and (E), provides that agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-15 (1971).

Generally, an agency's construction of the statute it administers is governed by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (*Chevron*). There are two steps to a court's review under *Chevron*. First, the court must determine whether Congress "has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-43. If Congress's intent is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. If the statute is found to be ambiguous, then the Court must apply the second step of the *Chevron* review, which involves determining whether the agency's interpretation is based upon a permissible construction of the statute. *Id*. The Supreme Court further stated in *Chevron* that when it appears from the legislative history that an agency's interpretation "is not one that Congress would have sanctioned," a court should not defer to the agency's interpretation. *Id*. at 845.

The Supreme Court has applied a similar standard to its review of an agency's regulations. A court is required to defer to an agency's interpretation of its own regulation "only when the regulation is ambiguous." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000). In particular, a court should not defer to an agency's interpretation of its own regulation when an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (*citing Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). Although the Secretary is entitled to some deference in interpreting his own regulations, when a regulation is ambiguous, that deference "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *U.S. v. Mead*

*Corporation*, 533 U.S. 218, 228 (2000) (*citing Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)).

## V. ARGUMENT

### A. The CMS Administrator's Decision is Contrary to the Plain Language of the IME Statute and Regulation

#### 1. *The IME Statute Mandates that the IME Resident Count Include All Resident Time*

The controlling IME statute, 42 U.S.C. § 1395ww(d)(5)(B), sets forth the formula for calculating a hospital's IME payment adjustment. Nothing in the IME statute allows the Secretary to exclude resident research time (whether related to direct patient care or not) from the calculation of a hospital's resident FTEs for IME purposes. In fact, the formula provides that *all* resident time should be included in calculating the IME Adjustment Factor by using a hospital's teaching intensity as reflected in the ratio of the number of residents to the number of beds. 42 U.S.C. § 1395ww(d)(5)(B).

The legislative history of the IME statute also shows that limiting residents' reimbursable time to direct patient care activity is inconsistent with Congress's intent. Congress enacted the IME statute because it believed that the PPS rates were insufficient to reimburse teaching hospitals for the increased costs associated with training medical residents. Because these increased costs were not quantifiable, Congress chose to use the hospital's "teaching intensity" – the ratio of residents to beds – as a proxy for a hospital's actual IME costs. *See Riverside*, 2003 U.S. Dist. LEXIS 15163 at *6-7. Accordingly, Congress never intended that the IME Adjustment Factor be based on a hospital's actual experience of the increased costs it incurs when residents furnish patient-related care; nor was it intended to count only certain kinds of resident research activities when establishing a hospital's FTE count of its residents. Rather, Congress believed that teaching hospitals' increased costs arise out of a multitude of factors and

that "teaching intensity" was the proper benchmark for estimating those costs. *See* H.R. Rep. 98-25(I), at 140-41.

Consequently, the IME adjustment was never intended to reimburse hospitals for the specifically identifiable costs of training residents to provide direct patient care. On the contrary, that is what the direct GME reimbursement is intended to accomplish. Instead, Congress recognized that teaching hospitals experience a range of other increased costs in educating residents, and that the best means to account for these immeasurable costs was to add a non-judgmental factor to the IME adjustment, one that is generated by dividing the total number of residents working at a teaching hospital (irrespective of the time they spend on research activities that are unrelated to direct patient care) by the number of hospital beds. If Congress had intended for the IME adjustment to be a detailed cost reporting scheme tied to the provision of patient-care services by residents, it would have specified an entirely different method for calculating the IME adjustment.

### 2. *The IME Regulation in Effect in 1996 Did Not Exclude "Research" Time That Was Unrelated to Direct Patient Care From the Resident Count*

Consistent with the IME statute, the regulation in effect during fiscal year 1996 did not exclude from the FTE count resident research time that was unrelated to direct patient care. 42 C.F.R. § 412.105(g). The regulation unambiguously sets forth two – and only two – conditions that a resident must meet to be counted in full toward a hospital's total FTE count. First, the resident "must be enrolled in an approved teaching program." 42 C.F.R. § 412.105(g)(1)(i). Second, the resident "must be assigned to one of the following areas: (i) the portion of the hospital subject to the prospective payment system [,or] (ii) the outpatient department of the hospital." 42 C.F.R. § 412.105(g)(1)(ii). Until 2001, there was no suggestion in the regulatory history of this regulation that resident research time that was unrelated to direct patient was not

includible in the IME FTE count. Just the opposite is true: the "total time necessary to fill the residency slot" was the standard for counting FTEs. 42 C.F.R. § 412.105(g)(1)(iii).

It is undisputed that that all the affected residents at issue in this case were enrolled in an approved teaching program. A.R. at 190, 207. The residents met the second criterion as well, in that all were assigned to a portion of the hospital subject to the PPS system or to an outpatient department of RIH. *See, e.g.,* A.R. at 171, 199-203. The PRRB recognized (upon its review of the entire record, including all documentary evidence and testimony) that this was an undisputed fact. A.R. at 35. There is no evidence in the administrative record showing that the Secretary has demonstrated that any of the residents in question failed to meet any of the two requirements set forth in Section 412.105(g)(1)(ii).

Further, at the time of the audit, the Intermediary did not allege that any of the residents in question failed to meet either of these two requirements. A.R. at 193, 236-37. Instead, the Intermediary's sole basis for the adjustment was that the residents were engaged in research, which the Intermediary believed was not an "allowable" activity. A.R. at 236-37, 243-44. Thus, by suddenly contending that all the residents' research time had to be excluded because it was not all directly related to patient care, the CMS Administrator grafted a third requirement onto the regulation in effect at that time that nowhere appears on its face; namely, that to be included within a hospital's IME adjustment, its residents must not have spent any time conducting research that was unrelated to direct patient care. In doing so, however, the CMS Administrator disregards the plain language of both the applicable IME statute and regulation, neither of which limited the count of resident FTEs based on whether they engaged in any research or any other activity that was directly related to patient care.[8] Without a statutory or regulatory basis to do so,

[8] In fact, at the PRRB hearing, the government's own witness conceded that the regulations in effect during fiscal year 1996 did not exclude such research time from inclusion in the FTE count for residents. A.R. at 233.

the CMS Administrator's attempt to retroactively exclude resident research time from the IME count is improper and without legal authority.

B. RIH Met the IME Requirements in Effect in 1996

The record shows that RIH (i) enrolled its residents in an approved teaching program; and (ii) assigned its residents to either the portion of RIH subject to PPS or to an outpatient department of RIH. 42 C.F.R. § 412.105(g)(1)(i), (ii). In an attempt to exclude these residents from RIH's FTE count for fiscal year 1996, the CMS Administrator raised an entirely new issue in her decision, alleging that the residents in question were not "assigned" to the PPS portion of RIH or to an outpatient department of RIH.[9] A.R. at 10. But, this conclusion disregarded the substantial evidence in the administrative record incontrovertibly establishing that all the residents in question were, in fact, properly assigned to a portion of RIH that was subject to the PPS or to an outpatient department of RIH. A.R. at 199-203, 171.

The residents were listed on a rotation schedule that identified both the location of the resident (*e.g.*, RIH or another hospital participating in the residency program, such as the Veterans Administration hospital) and the type of activity (*e.g.*, medical/surgical, intensive care, etc.). The rotation schedules included the resident's name, the location, and the type of

[9] It should be noted that the IME statute does not mandate that residents be assigned to the PPS portion of the hospital or to an outpatient department. Rather, the statute only directs that the Secretary provide an IME adjustment "in an amount computed in the same manner as the adjustment for such costs" which was in effect as of January 1, 1983. 42 U.S.C. § 1395ww(d)(5)(B). Notably, in 1986, Congress expressly rejected an attempt by the Secretary to exclude from the IME resident count time spent by residents furnishing outpatient services because the Secretary claimed that "the outpatient services are not subject to the prospective payment system." 50 Fed. Reg. 35,646, 35,678 (Sept. 3, 1985). In the Comprehensive Omnibus Reconciliation Act of 1986, Congress amended the IME statute to adopt the payment formula utilized today and, in doing so, reminded the Secretary that "[t]here is no discretion on the part of the Secretary" in calculating a hospital's IME adjustment. *See* H.R. Rep. No. 99-241(I), at 15. Congress further noted that the Secretary's attempt to exclude outpatient time was "technically incorrect because the regression analysis used to compute the adjustment factor was based on counts that included the interns and residents in hospital based outpatient settings." *Id.* Thus, in attempting to exclude outpatient services from the IME count, the Secretary failed to follow the plain language of the statute which required that the IME adjustment be computed "in the same manner" as it was done in 1983, which only required that the resident be enrolled in an approved graduate medical education program and assigned to the hospital.

rotation.[10] *See e.g.,* Medicine/General Internal Medicine Rotation Schedule. A.R. at 1348-52. The activity identified on the schedule is the type of rotation, not the "service area to which the resident was assigned," as allegedly by the Secretary. Notably, none of the rotation schedules used the term "service area," which appears to be a phrase created solely by the CMS Administrator, and this term was not mentioned during the in-person PRRB hearing.

RIH's witness, Christopher Francazio, testified at the PRRB hearing that RIH's methodology was to check off "RIH" as the location and then specify "research" or whatever activity was being performed as part of an approved training program. A.R. at 200-201. For any residents included, a checked-off "RIH" indicates the activity occurred in a unit of RIH subject to PPS. The only instance where the rotation schedule would indicate a non-PPS activity at RIH was if the resident participated in a psychiatry rotation in which case the inpatient psychiatric unit was not, at the time, subject to the PPS.[11] A.R. at 201. Based upon the rotation schedule, RIH removed all residents from the IME count who were assigned to the psychiatry unit. *Id.* These are the residents who were excluded as not meeting "assigned to" part of the IME regulation.

In her decision, the CMS Administrator entirely misreads RIH's rotation schedule by concluding that the activity was a specified "service area" that failed to identify whether a resident was properly assigned to a PPS unit or to an outpatient department. A.R. at 10. This is

[10] In addition, the cost report submitted by RIH for fiscal year 1996 only reported on those resident activities that were performed in a PPS unit or an outpatient department as required by the cost reporting regulations. *See* 42 C.F.R. ¶ 412.105(f)(2). RIH used the rotation schedules to track the residents' training activities.. A.R. at 193.

[11] In 1996, in addition to the psychiatric unit, the inpatient rehabilitation unit also was excluded by statute from the inpatient PPS. Although RIH closed its inpatient rehabilitation unit in 1995, it was retained on the rotation schedule form for 1996 based on guidance from the Intermediary. The rotation schedule also listed as an activity the ventilator unit which was likewise excluded from PPS. There were no inpatient rehabilitation or ventilator rotations, however, for any of the FTEs at issue for fiscal year 1996. A.R. at 201. In addition, RIH excluded from its IME count those residents who rotated to another hospital (in which case no IME or GME was claimed by RIH because the receiving hospital would have claimed the IME or GME payment to which it was entitled). A.R. at 200.

incorrect. The correct and, in fact, more reasonable interpretation of the schedule is that it was a tracking device to identify residents who completed research as a scholarly component of their training program during the course of their academic year.

Moreover, the CMS Administrator's erroneous interpretation of the designations in RIH's rotation schedule is contrary to the overriding purpose of the IME statute. A resident's assignment to a particular rotation, for example medical/surgical, did not cease simply because that resident was also fulfilling his or her required research responsibilities. The regulatory requirement of "assigned to" does not require that, at all times during the working day, a resident must be working in a particular PPS unit of the hospital or in an outpatient department. If that were the case, then residents could never take a class, attend a seminar, go to the library, or engage in other such activities. Indeed, the residents are included in the FTE count even when they are on vacation, and the Intermediary acknowledged that this time need not come out of the FTE count. A.R. at 238-239. Further, as the record shows, 35 hours or more a week is considered to be one FTE – yet residents, on average, were spending more than 70 hours a week at RIH. A.R. at 181, 219. Thus, even if a resident were to spend some portion of his or her time in activities, such as research that was unrelated to direct care of a particular patient, the resident should still be counted in full as an FTE.

In short, there is substantial evidence in the record showing that RIH met the applicable IME requirements in 1996 and the CMS Administrator erred in ignoring this evidence and arbitrarily excluding all research time from RIH's FTE count.

C. The Secretary's Retroactive Application of the 2001 Regulation Violates the APA

As discussed above, in 2001 CMS amended the IME regulation to add new language that precludes hospitals from obtaining an IME payment adjustment for "[t]he time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient. .

. . ." 42 C.F.R. § 412.105(f)(1)(iii)(B) (2001). CMS claimed that the 2001 Rule was only intended to "reiterate [the agency's] longstanding policy regarding time that residents spend in research. . . ." 66 Fed. Reg. at 39896.

The evidence shows, however, that the 2001 Rule was not merely a "clarification" of historical Medicare policy. Rather, it constituted a new rule that, under settled administrative law principles, cannot be applied retroactively to 1996. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect. . . ." 5 U.S.C. § 551(4). In the seminal Medicare case of *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988), the Supreme Court made clear that "[r]etroactivity is not favored in the law". . In that case, the Court held that "administrative rules will not be construed to have retroactive effect unless their language requires this result . . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id*. at 208.

CMS's argument that the 2001 Rule merely clarified existing Medicare law and policy is not supported by the IME statute or regulation – nor even by CMS's own guidance at the time. Nothing in the statute, regulation, or Federal Register issuances prior to 2001 suggested, directly or even indirectly, that resident research time that was unrelated to direct patient care was excluded from a hospital's resident count for IME purposes.[12] *See* 42 U.S.C. § 1395ww(d)(5); 42 C.F.R. § 412.105(g). Indeed, the Intermediary's witness at the PRRB hearing admitted that

[12] As discussed above, the IME payment is an add-on to the PPS payment amount. The IME statute was enacted as part of the PPS system precisely because there were costs arising from medical education that could not be measured and, thus, reimbursed on a cost basis.

nothing in the statute, regulation or other instructions prior to 2001 excluded resident research time. A.R. at 235-36.

Other than the self-serving, conclusory Preamble discussion to the 2001 Rule, CMS has not offered any persuasive evidence that it followed a "longstanding policy" to exclude such research time from the IME FTE count at any time before 2001, much less in 1996. On the contrary, the record shows that until 2001, CMS took the position that resident research time should be *included en toto* in the IME count so long as: (1) "the majority of the program time is actually spent outside of research" and (2) "where the intern or resident is involved in direct patient care." Letter from Tzvi M. Hefter, Director, Division of Acute Care, CMS (Sept. 24, 1999).[13] A.R. at 1331. Although Mr. Hefter in his 1999 letter did not cite any statutory provision or regulation that established this "policy," he made clear that, at least in 1999, CMS believed that research time *should be counted* provided that the above requirements were met. This letter also shows that CMS in 1999 did not propose the categorical exclusion of resident research time and, in fact, provided for the inclusion of all research time that so qualified.

The absence of any evidence showing the existence of a policy to exclude research time that was unrelated to patient care prior to 2001 demonstrates that the 2001 Rule was not "longstanding policy."[14] Rather, the evidence shows that in 1999 CMS policy supported the inclusion of such time in calculating a provider's IME payment adjustment. Consequently, application of the 2001 Rule to RIH's 1996 cost reporting year would violate a basic principle of administrative rulemaking under the APA. *See* 5 U.S.C. § 551(4).

---

[13] Mr. Hefter currently serves as Director of the Division of Acute Care at CMS and he authored CMS's position statement submitted to the CMS Administrator as part of his review of this case. A.R. at 21-25.

[14] Indeed, testimony presented at the PRRB hearing showed that many providers within the Intermediary's jurisdiction and the Intermediary itself were not even aware of the 2001 policy change. A.R. at 239-41.

D. The Court Should Follow the Holding and Reasoning in *Riverside Methodist Hospital v. Thompson*

In the case of *Riverside*, a federal district court addressed and rejected the Secretary's attempt to exclude resident research time from the IME payment adjustment. The issues presented in *Riverside* are nearly identical to those in this case and the court's reasoning provides the correct framework for deciding this case.[15]

In *Riverside*, the hospital's fiscal intermediary excluded resident time spent in scholarly activities, such as journal clubs and seminars, because the time was not "related to 'hands-on patient care.'" *Riverside*, 2003 U.S. Dist. LEXIS 15163 at *9. In reversing the Secretary's decision, the court reached two distinct but related conclusions: (i) the Secretary had to comply with the necessary procedures for amending regulations if he wanted to exclude time from the IME count (i.e., the Secretary cannot apply the 2001 rule governing resident research time retroactively); and (ii) resident time spent on activities other than direct patient care *cannot* be excluded from the IME payment adjustment. *Id*. at * 14-17, 37.

On the first issue, the court stated that "[t]o insert a new requirement in the regulation" (i.e., to apply the rule retroactively), "would be to illegally change the regulation without the necessity of complying with the procedures mandated by the Administrative Procedure Act." *Id.* at *17-19. Moreover, the court specifically rejected the Secretary's contention – also made here – that the addition of the research exclusion rule in 2001 was merely a "clarification of longstanding policy." *Id.*

The *Riverside* court also held that the Secretary's exclusion of residents' time spent on activities that were unrelated to direct patient care, such as time spent attending seminars, from the IME adjustment was "contrary to the both the plain language of the applicable regulation and

---

[15] Like the instance case, *Riverside* involved adjustments to the hospital's 1996 cost reporting period.

the methodology adopted by Congress for the reimbursement of the indirect costs of medical education provided by teaching hospitals." *Id*. at *37. The court reached this conclusion based on the evident purpose of IME reimbursement methodology; namely, to reimburse teaching hospitals for the immeasurable increased costs associated with training residents. Id. at *35-36. To exclude residents' activities, such as research, that are not related to direct patient care unjustifiably presumes that only patient care activities contribute to those increased costs at teaching hospitals. But the court held that this was an incorrect presumption because it was contrary to the "[t]he clear and rather obvious answer to the question of whether the FTE resident count is restricted to time spent in the direct care and treatment of patients. [The answer] is found in the undeniable fact that the regulation [42 C.F.R. § 412.105] simply contains no such requirement." *Id*. at *15 n.6.

## IV. CONCLUSION

For the foregoing reasons, RIH respectfully requests that the Court grant its motion for summary judgment, and deny defendants' motion for summary judgment.

Respectfully submitted,

RHODE ISLAND HOSPITAL
By its counsel,

/s/Mitchell R. Edwards
Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com

Lawrence W. Vernaglia (admitted *pro hac*)
Foley & Lardner LLP
111 Huntington Ave.
Boston, MA 02199
(617) 342-4079
(617) 342-4001 (facsimile)
lvernaglia@foley.com

Dated: December 27, 2006

**CERTIFICATION**

I hereby certify that on December 27, 2006, a copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Mitchell R. Edwards
Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com