IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL, Plaintiff, v. MICHAEL O. LEAVITT, et al., Defendants. | ) | Civ. Action No. 06-05 ET |

**DEFENDANTS' OBJECTION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 7(b) of the Civil Rules of this Court, defendants in the above-captioned action hereby object to plaintiff's motion for summary judgment. The grounds for this objection are set forth in the accompanying memorandum of law.

Respectfully submitted,

OF COUNSEL:
DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

CLIFFORD PIERCE
Attorney
U.S. Department
of Health and Human Services

PETER D. KEISLER
Assistant Attorney General

ROBERT CLARK CORRENTE
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

/s/ Peter Robbins
PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| RHODE ISLAND HOSPITAL,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, et al.,<br><br>Defendants. | Civ. Action No. 06-05 ET |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:
DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

CLIFFORD PIERCE
Attorney
U.S. Department
of Health and Human Services

PETER D. KEISLER
Assistant Attorney General

ROBERT CLARK CORRENTE
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov
Attorneys for Defendant

# TABLE OF CONTENTS

INTRODUCTION. . . . . 1

STANDARD OF REVIEW. . . . . 2

ARGUMENT. . . . . 3

I. SCHOLARLY RESEARCH CAN BE EXCLUDED FROM THE FTE COUNT UNDER A REASONABLE READING OF 42 C.F.R. § 412.105(f) AND ITS PREDECESSOR REGULATION. . . . . 4

A. Scholarly Research Is Not "Subject to the Prospective Payment System" Because It Is Not Necessary for the Efficient Delivery of Patient Care. . . . . 5

B. Scholarly Research Does Not Occur in the "Portion of the Hospital" that Is Subject to the Prospective Payment System. . . . . 6

C. Residents Are Not "Assigned" to the Portion of the Hospital that Is Subject to the Prospective Payment System When They Are Assigned to the Area of Scholarly Research . . . . . 11

D. The Secretary Is Required to Reduce the FTE Count by Time that a Resident Spends Outside the Portion of the Hospital Subject to the Prospective Payment System. . . . . 12

E. Plaintiff's Reliance on Riverside Methodist Is Misplaced. . . . . 12

II. THE SECRETARY'S POSITION DOES NOT DEPEND ON A RETROACTIVE APPLICATION OF THE 2001 CLARIFICATION. . . . . 14

III. THE SECRETARY'S READING OF THE REGULATION DOES NOT CONFLICT WITH ANY UNAMBIGUOUS LANGUAGE IN THE AUTHORIZING STATUTE. . . . . 16

CONCLUSION. . . . . 20

## INTRODUCTION

In their motion for summary judgment, defendants presented four reasons why it was reasonable for the Secretary of Health and Human Services to exclude purely scholarly research from the full-time equivalent ("FTE") count used to compensate the plaintiff teaching hospital for cost increases presumed to occur as an "indirect" consequence of the "involvement" of student doctors in "patient" care. H.R. Conf. Rep. No. 105-217 at 816 (1997), as reprinted in 1997 U.S.C.C.A.N. 176, 437. First, defendants showed that, because scholarly research is not subject to the prospective payment system created by Congress in 42 U.S.C. § 1395ww(d), it can fairly be said to occur outside the "portion of the hospital subject to the prospective payment system" within the meaning of 42 C.F.R. § 412.105(f)(1)(ii)(A). Second, defendants demonstrated that this conclusion does not require any retroactive application of the 2001 clarifying regulation, which now explicitly provides that "time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient" cannot be included in the FTE count. 42 C.F.R. § 412.105(f)(1)(iii)(B). Third, defendants showed that exclusion of scholarly research from the count does not conflict with any unambiguous command in the underlying Medicare statute, which authorizes the Secretary to determine the amount of the indirect medical education ("IME") adjustment "in the same manner" as he was previously authorized to adjust reasonable-cost limits. 42 U.S.C. § 1395ww(d)(5)(B). Finally, defendants showed that plaintiff's claim for payment was not supported by adequate documentation that any time self-described by the hospital as devoted to "research" was really devoted to the treatment or diagnosis of particular patients. Plaintiff does not move for summary judgment on the fourth point, and it does not persuasively address the first three. Plaintiff's cross-motion should therefore be denied for the same reasons that defendants' motion for summary judgment should be granted.

## STANDARD OF REVIEW

Before addressing the substantive arguments, defendants must correct a serious error that appears in plaintiff's discussion of the standard of judicial review. As defendants explained in their own opening memorandum, the standards under which courts review the Secretary's reading of Medicare statutes and regulations are well settled. With respect to the statute at issue here, this Court must defer to the Secretary's construction unless "the statute unambiguously forbids the Agency's interpretation," Barnhart v. Walton, 535 U.S. 212, 218 (2002) (emphasis added), or his reading is otherwise outside "the bounds of reasonable interpretation." Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999) (citing Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 (1984)) (emphasis added). The Secretary's understanding of his own regulations is entitled to even "more" deference, Udall v. Tallman, 380 U.S. 1, 16 (1965), and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Udall, 380 U.S. at 16-17, quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)) (emphasis added).

Although plaintiff pays lip service to these demanding tests, Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem.") at 13, it adds a caveat that has no basis in law or logic. Defendants are not aware of any authority for the novel proposition that, "when a regulation is ambiguous," id., the deference owed to the Secretary's interpretation "'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." Id. (quoting United States v. Mead Corp., 533 U.S. 218, 228 (2001), citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). The Mead decision

on which plaintiff relies does not even discuss the standard for reviewing an agency's interpretation of its own regulation at all. It addresses the "fair measure of deference," 533 U.S. at 228, that is owed to "an executive department's construction of a statutory scheme it is entrusted to administer," id. at 227-28 (quoting Chevron, 467 U.S. at 837) (emphasis added), and the decision emphasizes that the scrutiny of agency statutory interpretations can "vary with circumstances." Id. at 228. Where, as here, the Secretary's construction of a statute is articulated both in "notice-and-comment rulemaking" and a "formal adjudication," id. at 230, Mead expressly commands that "a reviewing court has no business rejecting an agency's" interpretation merely because the court finds the reading to be "unwise," but rather it is "obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." Id. at 229. The Skidmore "power to persuade" test applies only where the agency's statutory interpretation is not embodied in a "rulemaking or adjudication that produces regulations or rulings for which deference is claimed," id., and, even then, only in very limited circumstances.[1] The Skidmore factors therefore do not even apply to the statutory question at issue in this case, and they are certainly irrelevant to the regulatory analysis.

[1] Dicta in Mead indicated that the absence of a "formal process" of rulemaking or agency adjudication "alone" does not necessarily "bar the application" of full Chevron deference, 533 U.S. at 231, so long as it is reasonably clear that Congress expected the Secretary to exercise interpretive authority. Id. at 231 & n.13. In Barnhart, the Supreme Court subsequently held that Chevron applies with full force in the absence of rulemaking or adjudication in a setting where "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation." 535 U.S. at 222.

## ARGUMENT

When it is re-arranged into logical order, plaintiff's cross-motion for summary judgment raises three issues. The first is whether there is any language in 42 C.F.R. § 412.105(f)(1) (formerly 42 C.F.R. § 412.105(g)(1) (1996)) that unambiguously compels the Secretary to include scholarly research in the "full-time equivalent" count. The second is whether the exclusion of scholarly research can be accomplished without a retroactive application of the regulatory provision that expressly clarified the point in 2001. 42 C.F.R. § 412.105(f)(1)(iii)(B). The third is whether there is anything in the authorizing statute, 42 U.S.C. § 1395ww(d)(5)(B), that unambiguously forbids the Secretary's interpretation. Contrary to plaintiff's view, these are not questions of fact to be decided by the competing opinions of witnesses at the administrative hearing. See Pl. Mem. at 18. They are questions of law to be decided by this Court through careful examination of the relevant regulation and statute. Although plaintiff argues strenuously that it has the better reading of the regulation and statute, it makes no serious attempt to make the required showing that its reading is the only one that is reasonable.

### I. SCHOLARLY RESEARCH CAN BE EXCLUDED FROM THE FTE COUNT UNDER A REASONABLE READING OF 42 C.F.R. § 412.105(f) AND ITS PREDECESSOR REGULATION.

Contrary to plaintiff's view, the relevant language in 42 C.F.R. § 412.105(f)(1) can permissibly be construed to exclude purely scholarly research from the FTE count without having any new words "grafted" onto it. Pl. Mem. at 16. The regulatory scheme provides, in pertinent part, that "the total time necessary to fill a residency slot," 42 C.F.R. § 412.105(f)(1)(iii)(A), should be included in the FTE count, minus the "proportion of time," id., when the resident is "assigned," 42 C.F.R. § 412.105(f)(1)(ii), outside the "portion of the hospital subject to the

prospective payment system." 42 C.F.R. § 412.105(f)(1)(ii)(A).[2] To determine whether this language must be construed as unambiguously mandating the inclusion of time spent while a resident is assigned to the area of scholarly research, it is necessary to answer three questions. The first is whether scholarly research must be deemed to be "subject to the prospective payment system." If this Court concludes that scholarly research is not subject to the prospective payment system, the second question is whether such research must nonetheless be deemed to occur within the "portion" of the hospital that is. If the Court concludes that scholarly research can reasonably be said to occur outside the portion of the hospital subject to the prospective payment system, the final question is whether a resident must nonetheless be considered to be "assigned" to spend all his time in the portion of the hospital subject to the prospective payment system, even during hours when the hospital's own records indicate that he was assigned to do research. Plaintiff simply fails to proffer persuasive answers to these questions.

### A. Scholarly Research Is Not "Subject to the Prospective Payment System" Because It Is Not Necessary for the Efficient Delivery of Patient Care.

On the most important issue – whether scholarly research is "subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A) – plaintiff has surprisingly little to say. Plaintiff does not deny that the "prospective payment system" to which 42 C.F.R. § 412.105(f)(1)(ii)(A) refers is the one created by Congress for acute-care hospitals in 42 U.S.C. § 1395ww(d). Plaintiff does not deny that only "operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(d)(1)(A), are subject to this prospective payment system. Plaintiff does not deny that the operating costs of inpatient hospital services include only those costs that are

---

[2] During the times relevant to this case, this regulatory language appeared at 42 C.F.R. § 412.105(g)(1)(A) (1996) and 42 C.F.R. § 412.105(g)(1)(iii) (1996).

necessary for "the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Plaintiff does not deny that research is necessary for the efficient delivery of needed health services only when it is "conducted in conjunction with, and as part of, the care of patients," 42 C.F.R. § 413.90(b)(2), and not when it is undertaken for scholarly purposes "over and above usual patient care." 42 C.F.R. § 413.5(c)(2). It can therefore reasonably be said that scholarly research is not subject to the prospective payment system.

**B. Scholarly Research Does Not Occur in the "Portion of the Hospital" that Is Subject to the Prospective Payment System.**

Having effectively conceded that scholarly research is not "subject to the prospective payment system," plaintiff faces a daunting task to explain why a reasonable person would nonetheless have to conclude that such research is conducted in the "portion of the hospital" that is subject to the prospective payment system. Plaintiff does not deny that the word "portion" can reasonably be defined to mean a "share" or a "part of any whole, either separated from or integrated with it." Random House Webster's Unabridged Dictionary 1507 (2d ed. 2001).[3] Although the word "portion" can be read to connote a part that is physically and permanently segregated from other parts of the whole, it does not have to be read that way. It can equally be read to connote a share that is differentiated by function at different times without being segregated into a physically separate building or wing. Ownership of a portion of land, for instance, can be described in terms of a spatial division, or in terms of an undivided part of the whole, or in terms of a time share that depends on the use to which the land is being put at any

---

[3] See also Black's Law Dictionary 1200 (8th ed. 2004) ("share" or "allotted part"); XII Oxford English Dictionary 155 (2d ed. 1989) ("a part of the whole"); Webster's Third New International Dictionary 1768 (1971) (same); William C. Burton, Burton's Legal Thesaurus 411 (3rd ed. 1998) ("component," "element," "share"); Roget's International Thesaurus 1105 (6th ed. 2001) ("share").

particular moment in time. It is in this latter sense that a portion of a hospital wherein scholarly research occurs can most clearly be said to be outside the portion subject to the prospective payment system.

In District Memorial Hospital v. Thompson, 364 F.3d 513 (4th Cir. 2004), the Court of Appeals for the Fourth Circuit applied such a time-based and functional approach to an issue of regulatory construction with several parallels to this case. Apart from the add-on to the prospective payment system that it created for the indirect effects of graduate medical education, Congress also created an adjustment designed to compensate hospitals for cost increases believed to occur as a consequence of treating a disproportionately larger share of indigent patients. 42 U.S.C. § 1395ww(d)(5)(F). This "disproportionate share" payment used a patient's eligibility for Medicaid as a proxy for indigence. Regulations promulgated by the Secretary limited the count of Medicaid "patient days," 42 C.F.R. § 412.106(a) (1989), to "only those days attributable to areas of the hospital that are subject to the prospective payment system." 42 C.F.R. § 412.106(a)(1)(a)(ii) (1989).

The issue in District Memorial arose over the status of so-called "swing beds" that were used on some days for acute care (which was subject to the prospective payment system) and on some days for skilled nursing care (which was not). The issue in the case was whether the language of the regulation could reasonably be read to exclude swing-bed days "whenever they were used to provide nursing care." 364 F.3d at 514 (emphasis in original). The hospital took the position that days spent by patients in "areas of the hospital that are subject to the prospective payment system," 42 C.F.R. § 412.106(a)(1)(a)(ii) (1989), must include "the days on which its patients received skilled nursing services in its swing beds because the beds were physically located in an area licensed for acute care." Dist. Mem'l, 364 F.3d at 517. The Provider

Reimbursement Review Board ruled in favor of the hospital, and the Secretary reversed the decision. Id. The Secretary eventually issued a clarifying regulation which, subject to certain exceptions, excluded swing beds from the count on days when they were used for skilled nursing care. 42 C.F.R. § 412.106(a)(1)(ii)(B).

The issue before the court in District Memorial was whether, before the clarification, the regulation could reasonably be read to exclude "the days that patients spent in the hospital's swing beds receiving skilled nursing care and count only the number of days that patients spent in swing beds receiving acute care, which is subject to the prospective payment system." 356 F.3d at 518. The court set forth the positions of the two parties in a manner that mirrors the arguments in this case.

> District Memorial Hospital contends that, in calculating the disproportionate share adjustment, it may include patient days "attributable to areas of the hospital that were subject to the prospective pay system," which in its case included all beds in the hospital. It argues that patient days attributed to any bed licensed for acute care must be included in the calculation, regardless of how the bed is actually used under the swing-bed arrangement. According to the hospital, regulation § 412.106 authorizes the disproportionate share adjustment based on "where a bed is located, not on what basis the hospital receives reimbursement for the beds." Because all beds at District Memorial Hospital are located "in the physical area of the hospital subject to the prospective payment system," they must be included in the calculation of patient days. When they are so included, the hospital states, it qualifies for the adjustment. The hospital argues that its "temporary use" of beds for nursing care in the area licensed for acute care is "irrelevant," because geographical area, not function, governs reimbursement of the adjustment. The district court agreed with the hospital and ordered that it be paid the disproportionate share adjustment.
>
> The Secretary, on the other hand, presses a non-geographical reading of the term "areas," arguing that the term refers to the scope of activity – in this case, the provision of acute care – rather than to all beds geographically located in a hospital wing licensed to provide acute care. Under the Secretary's construction, acute care services would be compensated under the prospective payment system as enhanced by the disproportionate share adjustment, wherever and whenever acute care services were provided, and nursing care services would be

> compensated under the reasonable cost system, wherever and whenever they were provided.

Id. at 518-19. The court agreed with the Secretary that his "longstanding" reading of the regulation was "a reasonable construction" of the regulation, id. at 519 (quotation marks omitted), for two reasons.

First, the court noted that the word "'area' may refer to a physical space" or "a geographical area," but it also "may refer to 'the sphere or scope of operation or action.'" Id. (quoting Webster's Third New International Dictionary 115 (1993)) (emphasis added).

> Under this alternative definition, "areas of the hospital that are subject to the prospective payment system" would encompass activities that are defined by whether they are reimbursed under the prospective payment system, regardless of where the activities geographically took place. In other words, "days attributable to the areas of the hospital that are subject to the prospective payment system" would mean "days attributable to hospital activities that involve acute care and therefore are reimbursed under the prospective payment system."

Id. "While it is true that this interpretation relies on an alternative definition of 'area,'" the court stated, "an agency's interpretation 'need not be the best or most natural one by grammatical or other standards," id. (quoting Pauley, 501 U.S. at 702), but rather "need only be a reasonable construction." Id. (quoting Thomas Jefferson, 512 U.S. at 506) (emphasis in original). The court therefore held that the Secretary's interpretation was reasonable on that ground alone.

"Even if one were to insist that the word 'area'" be read to carry a "geographical connotation," the court held that the Secretary's functional approach "would remain a reasonable construction of the regulatory language." Id.

> The word "area" would then refer to the location of any bed used to provide acute care when such services were being provided, and the disproportionate share adjustment would apply to that location at such times. Similarly, the word "area" would not refer to the location of a bed when skilled nursing services were being provided at that bed because such services were not "subject to the prospective payment system." Under this interpretation, the word "areas" in a geographical

> sense would be referring to the locations of individual beds, as opposed to wings or units of the hospital. Use of this meaning would result in the same interpretation advanced by the Secretary, who counted "patient days" when beds were actually being used for acute care. Although the reimbursement status of each swing bed might thus change daily, as the use of the bed shifted between acute care and skilled nursing care, such a daily reassessment would be consistent with the regulatory language, which refers to "days attributable to areas of the hospital that are subject to the prospective payment system."

Id. at 519-20. Finally, the court found that "policy considerations" also supported the Secretary's interpretation by preventing "overcompensation" because hospitals were already paid for skilled nursing care on a "reasonable cost" basis separate from the prospective payment system that was being supplemented by the disproportionate-share payment. Id. at 520.

The reasoning used by the Fourth Circuit in District Memorial to determine the permissible range of meaning that can be given to the phrase "areas of the hospital subject to the prospective payment system" applies with even more force to the meaning of the phrase "portion of the hospital subject to the prospective payment system." In the first place, it is not even necessary to choose between geographical and non-geographical definitions here, since it is undisputed that the word "portion" connotes a "share" or a "part of any whole, either separated from or integrated with it." Webster's Unabridged Dictionary at 1507. But, even if a strictly spatial connotation were deemed to be mandated, one could still reasonably say that the portion of the hospital "subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), is restricted to those particular locations wherein the "operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(d)(1)(A), are being generated at any particular time of the day.[4] And, as in

[4] The same space in a library, for instance, can be said to be subject to the prospective payment system when it is being used by a doctor to conduct research necessary for the care of a particular patient, but outside the portion subject to the prospective payment system when the same doctor is using the same space for scholarly research that is not related to care of an individual patient. This would be no different from saying that a front yard is within the portion

District Memorial, the Secretary's reading help would prevent the overcompensation of teaching hospitals, which are already paid for the costs of medical education under a payment system, 42 U.S.C. § 1395ww(h), separate from the prospective payment system created by Congress for acute-care hospitals under 42 U.S.C. § 1395ww(d). Plaintiff may not agree that this is the best way to read the phrase "portion," but it cannot deny that it is a reasonable reading.

### C. Residents Are Not "Assigned" to the Portion of the Hospital that Is Subject to the Prospective Payment System When They Are Assigned to the Area of Scholarly Research.

Once it is established that scholarly research can reasonably be said to occur outside the "portion of the hospital subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), the only question of regulatory construction that remains is whether a resident also can reasonably be said to have been "assigned" to the "area" of scholarly research, 42 C.F.R. § 412.105(f)(1)(ii), during the times when plaintiff's records show that he was doing "research" at the direction of his teachers. See Administrative Record ("A.R.") at 512-1020. The question all but answers itself. Plaintiff's contention that "there is no evidence in the administrative record" that any residents were assigned to do scholarly research, Pl. Mem. at 16, merely because the hospital administration subjectively chooses to characterize the nature of the "assignment" in other terms, id. at 17-18, is, to be charitable, ridiculous. The relevant question is a legal one – whether the Secretary can reasonably deem a resident to be "assigned" to do scholarly research, within the meaning of 42 C.F.R. § 412.105(f)(1)(ii), when he is assigned to do scholarly research. The answer is obvious.

---

of residential property subject to the control of the homeowner when it is being used for residential purposes, but outside the portion subject to the control of the homeowner when it is being used by the police or fire department for purposes of public safety.

**D. The Secretary Is Required to Reduce the FTE Count by Time that a Resident Spends Outside the Portion of the Hospital Subject to the Prospective Payment System.**

Plaintiff's final regulatory argument – that 42 C.F.R. § 412.105(f)(1)(iii)(A) (formerly 42 C.F.R. § 412.105(g)(1)(iii) (1996)) instructs that the FTE standard is based on the "total time necessary to fill [a] resident slot," Pl. Mem. at 16 – proves nothing. The regulation goes on to command that this total time be reduced by "the proportion of time" spent by the resident in an "area of the hospital other than those listed under paragraph (f)(1)(ii) of this section." 42 C.F.R. § 412.105(f)(1)(iii)(A). The meaning of subsection (f)(1)(ii) discussed above determines the amount of this proportional reduction.[5]

**E. Plaintiff's Reliance on Riverside Methodist Is Misplaced.**

In light of the foregoing analysis, plaintiff's reliance on the decision in Riverside Methodist Hospital v. Thompson, 2003 U.S. Dist. LEXIS 15163 (S.D. Ohio July 31, 2003), is unavailing. Defendants have no quarrel with the proposition that Riverside Methodist "rejected the Secretary's attempt to exclude research time" from the FTE count, Pl. Mem. at 22, but it is a stretch to say that the court "addressed" defendants' arguments. Id. As plaintiff's own discussion of the case nicely illustrates, the court did not address whether scholarly research is "subject to

---

[5] Defendants do not dispute that time spent in a "freestanding family practice center or an excluded hospital unit," 42 C.F.R. § 412.105(f)(1)(iii)(A), such as "psychiatric and rehabilitation units," 48 Fed. Reg. 39,752, 39,778 (Sept. 1, 1983), are examples of other kinds of assignments that also should be deducted from the count based on the language in paragraph (f)(1)(ii). See Pl. Mem. at 18. But the "omission" of other examples carries no "negative implication," Chevron U.S.A. v. Echazabal, 536 U.S. 73, 81 (2002), where there is no indication that the mentioned examples were "intended to be exhaustive." TWA v. Hardison, 432 U.S. 63, 72 n.7 (1977). See also, e.g., Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 649 (1990) (an "example, after all, is just that: an illustration of a statute's operation in practice" and not "a definitive interpretation of a statute's scope"); Comm'r v. Clark, 489 U.S. 726, 743 (1989) ("example" in legislative history of tax statute "should not be understood as exhaustive of the proper applications" of statute).

the prospective payment system." 42 C.F.R. § 412.105(f)(1)(ii)(A). It did not attempt to define the "portion" of the hospital subject to the prospective payment system. Id. And it did not address what it means to say that a resident has been "assigned" to a portion of the hospital subject to the prospective payment system. 42 C.F.R. § 412.105(f)(1)(ii). The court merely assumed, without discussion, that the "plain language of the regulation," Riverside, 2003 U.S. Dist. LEXIS at *15, compels the counter-intuitive conclusion that scholarly research that is not subject to the prospective payment system must necessarily be said to occur in the portion of the hospital that is subject to the prospective payment system. It then concluded that the "total time necessary to fill a residency slot," id. at *15 n.6, includes scholarly activities without making the appropriate deduction for the "proportion of time," 42 C.F.R. § 412.105(f)(1)(iii)(A), spent outside the "portion of the hospital subject to the prospective payment system." 42 C.F.R. § 412.105(f)(1)(ii)(A). Like plaintiff's argument here, the Riverside Methodist opinion is unpersuasive because it "simply" assumes that its reading of the regulatory scheme is "clear" and "obvious," id. at *15 n.6, without explaining why the Secretary's counter-reading is unreasonable.

The Riverside Methodist decision is problematic for other reasons, as well. For instance, the court chided the Secretary for "equat[ing]" a hospital's "operating costs" with its "patient care costs," id. at 29, only because it apparently was not given a clear explanation of what either term means. As defendants have previously explained, costs "subject to the "prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), include only the "operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(d)(1)(A), and the operating costs of hospital inpatient services include only those costs that are necessary for the "efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1). For purposes of the prospective payment system for inpatient operating costs for acute-care hospitals, "operating costs" and "inpatient-care costs" are the same. In

addition, the court appeared to think that it would be impossible, as a practical matter, for hospitals to distinguish research undertaken for purposes of the care of an individual patient with research activities of a scholarly nature whose fruits may later be applied to future cases. See Riverside 2003 U.S. Dist. LEXIS at 31 n.11. However, hospitals have long been required to isolate research "over and above usual patient care," 42 C.F.R. § 413.5(c)(2), for cost-reporting purposes. See Provider Reimbursement Manual ("PRM") § 504.1 (requiring establishment of a separate "research cost center" to account for costs incurred for research purposes, including "the cost of equipment and facilities which are more complex and specialized than needed to render usual patient care."). A.R. at 406. To suggest that the distinction has suddenly become impossible to draw in the context of research conducted by residents is absurd.[6]

## II. THE SECRETARY'S POSITION DOES NOT DEPEND ON A RETROACTIVE APPLICATION OF THE 2001 CLARIFICATION.

Plaintiff's second contention – that the Secretary applied the 2001 clarifying regulation in 42 C.F.R. § 412.105(f)(1)(iii)(B) in an impermissibly retroactive fashion, Pl. Mem. at 20-21 – merits little additional discussion. As defendants explained in their opening memorandum, the decision of the Deputy Administrator challenged here does not even rely on that provision. It merely mentions it in passing in a footnote. A.R. at 9 n.16. It is no more necessary for this Court to rely on the clarifying language in 42 C.F.R. § 412.105(f)(1)(iii)(B) to determine the range of meaning permissible under the language in 42 C.F.R. § 412.105(f)(1)(ii)(A) than it was for the Fourth Circuit in District Memorial to rely on the subsequent clarifying regulation in 42 C.F.R.

---

[6] This analysis also defeats plaintiff's complaint that the success of the Secretary's interpretation here would mean that "residents could never take a class, attend a seminar, go to the library, or engage in other such activities." Pl. Mem. at 19. The issue here is whether such non-patient-care time must be included in the FTE count, not whether such activities can be included in a residency program.

§ 412.106(a)(1)(ii)(B) to determine the range of meaning permissible under 42 C.F.R. § 412.106(a)(1)(a)(ii) (1989).

In any event, the proposition that scholarly research should be excluded from the FTE count is unarguably a "longstanding" one. 66 Fed. Reg. 39,828, 39,896 (Aug. 1, 2001). As was discussed above, plaintiff's own summary-judgment memorandum does not argue that scholarly research is "subject to the prospective payment system," 42 C.F.R. § 412.105(f)(1)(ii)(A), and offers little more than token resistance to the related concept that scholarly research occurs outside the "portion" of the hospital that is. Id. As was explained in defendants' opening memorandum, the Secretary's Provider Reimbursement Manual has long provided that time spent "exclusively" in scholarly research should be excluded from the FTE count, Administrative Record ("A.R.") at 145, because "[r]esearch" conducted by interns or residents was "not classified as time worked in the part of the hospital subject to PPS." Hospital and Skilled Nursing Facility Audit Program Exhibit 13, ¶ 9.D, at 13-21-13-22 (1996) (Def. Ex. A).[7] This exclusion has always applied "irrespective of whether the resident is engaged only in research" (as in the case of research fellow) or "spends only part of his or her time on research" (as in the case of the interns and residents at issue in this case). 66 Fed. Reg. at 39,896. The notion that this is a new position is completely without merit.[8]

---

[7] Plaintiff's contention that PRM § 2405.3.F.1 excludes only "entire individuals" from the count, Plaintiff's Memorandum in Support of its Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp.") at 4, conflicts with the examples given later in the manual that explain how proportional reductions in resident time should be made. A.R. at 148.

[8] The 1998 advisory letter of a division director at the Centers for Medicare & Medicaid Services on which plaintiff relies, Pl. Mem. at 21, merely reiterates that "time spent in clinical research areas where patient care is delivered" may be included in the FTE count "where the intern or resident is involved in direct patient care." A.R. at 1331. The letter is consistent with defendants' position here that research conducted for the purpose of diagnosing and treating

## III. THE SECRETARY'S READING OF THE REGULATION DOES NOT CONFLICT WITH ANY UNAMBIGUOUS LANGUAGE IN THE AUTHORIZING STATUTE.

Plaintiff's contention that the Secretary's reading of 42 C.F.R. § 412.105(f)(1)(ii)(A) conflicts with the unambiguous requirements of the underlying Medicare statute in 42 U.S.C. § 1395ww(d)(5)(B) also merits little further discussion. The exclusion of scholarly research from the FTE count does not conflict with any plain statutory command, nor does it conflict with the purpose of the IME adjustment. The Secretary's reading therefore passes muster under the Chevron standard.

The only argument based on statutory language that appears in plaintiff's summary-judgment memorandum – the contention that 42 U.S.C. § 1395ww(d)(5)(B) "does not mandate

---

individual patients may be included in the count, but research of a more general scholarly nature is not. Plaintiff's contention that there is some tension between the position taken by the Secretary in his adjudicatory decision and the argument advanced during the administrative proceeding by the fiscal intermediary that initially processed plaintiff's Medicare claim, Pl. Mem. at 16, is both incorrect and irrelevant. In the first place, for the intermediary to say that scholarly research should be excluded from the count because it is not an "allowable" cost, id. (quoting A.R. at 236-37, 243-44), is merely a shorthand way of saying that scholarly research is not subject to the prospective payment system and therefore does not occur in the "portion of the hospital subject to the prospective payment system." 42 U.S.C. § 412.105(f)(1)(ii)(A). In any event, it is well settled that even a complete misstatement of law by an intermediary does not estop the Secretary from applying the law correctly in subsequent administrative proceedings. See Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 59-66 (1984); Schweiker v. Hansen, 450 U.S. 785, 789-90 (1981). He can hardly be deemed to be estopped by a tersely-expressed rationale for a correct legal result. For the same reason, there is no legal significance in plaintiff's contention that "the government's own witness conceded that the regulations in effect during fiscal year 1996 did not exclude such research time from inclusion in the FTE count for residents." Pl. Mem. at 16 n.8 (citing A.R. at 233). Although, at plaintiff's request, the witness said he did not think the "explicit[]" wording of the IME regulation excluded scholarly research, A.R. at 233, he clearly explained that the "longstanding" policy, id. at 222, that "research cost [was] not an approved IME cost," id. at 236, "hasn't changed." Id. at 238. There is nothing in the record to suggest that the intermediary witness thought that the construction was outside the range of reasonable interpretation but, even if he did, his personal opinions would make not bind the Secretary.

that residents be assigned to the PPS portion of the hospital or to an outpatient department," Pl. Mem. at 17 n.9 (emphasis added) – is not responsive to the Chevron test. As discussed earlier, Chevron commands this Court to defer to the Secretary's statutory construction unless "the statute unambiguously forbids the Agency's interpretation," Barnhart, 535 U.S. at 218 (emphasis added), or his reading is outside "the bounds of reasonable interpretation" for some other reason. Your Home Visiting Nurse Servs., 525 U.S. at 453. Under this standard, it is never necessary – or even appropriate – for a court to consider whether the statute "compels" the Secretary's construction, because the "conclusions that Congress did not unambiguously manifest its intent to adopt [the plaintiff's] view and that the Secretary's interpretation is reasonable suffice to decide th[e] case." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 703 (1995). The question, therefore, is not whether the statute mandates the Secretary's view, but whether his reading is within the "zone of reasonable interpretation" that the statutory language permits. Verizon Commc'ns, Inc. v. FCC, 535 U.S. 467, 501 (2002).

On that score, plaintiff has understandably little to say. As was discussed in defendants' opening memorandum, the relevant statutory language authorizes the Secretary to adjust the PPS payment "in the same manner," 42 U.S.C. § 1395ww(d)(5)(B), as he was previously permitted to adjust reasonable-cost limits under regulations in effect as of January 1, 1983. Plaintiff itself concedes that the phrase "in a manner" can mean "so to speak," "after a fashion," or "somewhat," Pl. Opp. at 12 (quoting the Secretary's citation to Webster's Unabridged Dictionary at 1170), and it helpfully adds that the word "same" can mean anything from exactly "identical" to merely "similar." Id. (quoting Merriam-Webster's Collegiate Dictionary 1034 (10th ed. 1996)); see also Webster's Third New International Dictionary 2007 (1993) ("something identical or similar to another," "something that is a counterpart," "resembling in every way," "not different in relevant

essentials," "of like nature or identity," "equivalent," "tantamount"); I Oxford English Dictionary 429 (2d ed. 1989) ("[e]qually acceptable," "to the same effect"); American Heritage Dictionary 1088 (2d coll. ed. 1991) ("similar in kind, quality, quantity, degree"). Thus, the meanings which are reasonably permitted by the phrase "in the same manner" range from "completely identical in every detail" to "somewhat similar in relevant essentials." For example, whether two authors writing in different languages can be said to have expressed themselves "in the same manner" depends on the level of generality at which the inquiry is aimed.[9]

There is no reason in law or logic why the most extreme reading preferred by plaintiff here is the only one that is reasonably permissible. As defendants explained in their opening memorandum, the cost-limit notice that was in effect as of January 1, 1983 did not expressly address whether or not scholarly research should or should not be included in the FTE count. But the emphasis on "services" – meaning "health-care services" – being furnished by residents and the manner in which exclusions were couched in terms of the health-care services being furnished suggests that the exclusion of scholarly research was a permissible construction. Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 5-10, 16-18. Indeed, the cost limits did not even apply to the costs of scholarly research because they have never been considered to be an allowable cost. So long as such an exclusionary approach

---

[9] See, e.g., Cox v. Roth, 348 U.S. 207, 208-09 (1955) (fact that Jones Act gives seamen "the same rights granted to railway employees by the Federal Employers' Liability Act" does not mean "that the very words of the FELA must be lifted bodily from their context and applied mechanically to the specific facts of maritime events"); Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 765 (1989) ("that an intervenor can advance the same argument as a defendant does not mean that the two must be treated alike for purposes of fee assessments"); Gurich v. Comm'r, 295 F.2d 845, 847 (1st Cir. 1961) ("Even if a trust provides in general terms that the trustees may deal with the trust property in the same manner as if they were the owners, it does not mean that they are not subject to the usual trustee obligations and limitations.").

was permissible under the old cost limits, it was within the range of permissible approaches that Congress authorized when it instructed the Secretary to make an IME adjustment to the prospective payment "computed in the same manner," 42 U.S.C. § 1395ww(d)(5)(B), as the IME adjustment used for purposes of the cost limits.[10]

Plaintiff fares no better in its reliance on "the overriding purpose of the IME statute," Pl. Mem. at 19, to argue that the Secretary's reading is impermissible. The purpose of the IME adjustment is to compensate teaching hospitals for increases in costs presumed to occur as an "indirect" consequence of the "involvement" of student doctors in "patient" care. H.R. Conf. Rep. No. 105-217 at 816 (1997), as reprinted in 1997 U.S.C.C.A.N. 176, 437. Such costs "are understood to include the additional tests and procedures ordered by residents as well as the extra demands placed on other staff as they participate in the education process." H.R. Rep. No. 98-25(I) at 140 (1983), as reprinted in 1983 U.S.C.C.A.N. 219, 359. Thus, it makes sense to limit the count to the time when residents are involved in patient care – that is, the time when doctors-in-training would be doing things, like ordering "an increased number of tests," 66 Fed. Reg. at 39,897, that are likely to create additional "operating costs of inpatient hospital services," 42 U.S.C. § 1395ww(d)(1)(A), for which the uniform diagnosis-related payment may not be

---

[10] Plaintiff's reliance on subsequent legislative history for the proposition that "'[t]here is no discretion on the part of the Secretary' in calculating a hospital's IME adjustment,'" Pl. Mem. at 17 n.9 (quoting H.R. Rep. No. 99-241(I) at 15, as reprinted in 1986 U.S.C.C.A.N. 579, 593, (1985)), is disingenuous. The passage on which it relies merely stated that there was "no discretion" in how the "teaching adjustment formula" in 42 U.S.C. §§ 1395ww(d)(5)(B)(i)-(ii) was to be determined. H.R. Rep. No. 99-241(I) at 15, as reprinted in 1986 U.S.C.C.A.N. at 593. That passage says nothing about the construction of 42 U.S.C. § 1395ww(d)(5)(B) itself, other than to clarify that the FTE count is supposed to include the outpatient department. In any event, the Supreme Court has "said repeatedly that 'subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.'" Doe v. Chao, 540 U.S. 614, 626-27 (2004) (citation omitted).

adequate. See Dist. Mem'l, 364 F.3d at 520 (finding functional approach "more closely fits the policy considerations underlying" the disproportionate-share payment).[11]

## CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

ROBERT CLARK CORRENTE
United States Attorney

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

/s/ Peter Robbins
PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov
Attorneys for Defendants

OF COUNSEL:
DANIEL MERON
General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate
General Counsel for Litigation

CLIFFORD PIERCE
Attorney
U.S. Department
of Health and Human Services

[11] The foregoing analysis disposes of the grounds on which plaintiff seeks summary judgment. Plaintiff's memorandum also contains an oblique passage that apparently attempts to argue that, even if the Secretary's reading of the regulation and statute at issue is correct, he misclassified some residents as part-time FTEs when they should have counted as full-time FTEs because they allegedly worked "35 hours or more a week" in what the Secretary considers to be a countable patient-care setting. Pl. Mem. at 19. There are several flaws in this theory. First, no such allegation appears in plaintiff's complaint. Second, even if the complaint were amended, no such argument was raised during the administrative process, and therefore it cannot be raised here. See Sims v. Apfel, 530 U.S. 103, 109 (2000) (citing United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 36-37 (1952)). Third, plaintiff's argument fails to conduct the "proportion[al]" calculation of includable time mandated by the regulation. 42 C.F.R. § 412.105(f)(1)(iii)(A); see A.R. at 230. Finally, there is no documentation – as opposed to vague and general guesses – in the administrative record that any residents in fact put in 35 or more hours on patient care during any of the excluded weeks.

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 16, 2007, I filed the foregoing documents electronically with the ECF system where they are available for viewing and downloading; and caused them to be served on all counsel of record for plaintiff, as follows: by the ECF system to registered participants Mitchell Edwards, Esq. and Robert Flanders, Esq., and pursuant to the prior written agreement of the parties, to Lawrence Vernaglia, Esq. by electronic mail addressed to lvernaglia@foley.com.

/s/ Peter Robbins
PETER ROBBINS
U.S. Department of Justice
20 Massachusetts Ave, NW, Room 7142
Washington, DC 20530
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: peter.robbins@usdoj.gov