**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| RHODE ISLAND HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 06-05 ET |
| | ) | |
| MICHAEL O. LEAVITT, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**REPLY MEMORANDUM OF RHODE ISLAND HOSPITAL**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

In opposing the summary judgment motion of plaintiff Rhode Island Hospital ("RIH"), the defendant Secretary of Health and Human Services ("the Secretary") poses a series of questions. The answers to them, he says, lead to the conclusion that the Secretary reasonably interpreted the applicable statute and regulation in effect in 1996 to preclude Medicare indirect medical education ("IME") reimbursement to RIH for scholarly activities that its medical residents and interns engaged in while participating in an approved teaching program. The questions that the Secretary poses, however, are not the right ones to be answered for purposes of this case. Indeed, they attempt to skirt the plain language of the IME statute, the regulation in effect in 1996, and the legislative history and purpose of the IME payment adjustment. Congress has directly spoken on the precise question at issue and therefore the Secretary's alternative and convoluted "interpretation" is not entitled to deference from this Court.[1] The Court owes the Secretary no deference and should grant RIH's motion for summary judgment.

First, it is irrelevant to ask, as the Secretary does, whether scholarly research is subject to the prospective payment system ("PPS"). The Secretary argues that scholarly research of residents and interns is not subject to the PPS system because it is not necessary for the efficient delivery of patient care. (*See* Defendants' Objection at page 5.) But whether that proposition is true is a moot point. It is undisputable that scholarly activities, including research, are one component of approved residency training programs for teaching hospitals such as RIH. And Medicare participating hospitals such as RIH are entitled to an additional Medicare reimbursement payment, called the IME adjustment, for their indirect costs associated with

---

[1] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Further, the Supreme Court has clearly held that a court shall not defer to an agency's interpretation of its regulations when "an alternative reading is compelled by the regulation's plain language or by other indications of the agency's intent at the time of the regulation's promulgation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1988). Thus, this Court should not defer to the Secretary's reading when, as here, "it contravenes the clear intent of the agency in creating the rule." *Lal v. Immigration & Naturalization Service*, 255 F.3d 998, 1005 (9th Cir. 1999).

operating such approved residency training programs – irrespective of whether the program or any component of it is, in the Secretary's eyes, necessary for the efficient delivery of patient care. The IME adjustment was intended as a proxy to capture all the indirect costs that teaching hospitals incur in training and educating medical residents. Whether the daily activities of residents are necessary for the "efficient delivery of patient care" is simply immaterial to whether RIH is entitled to count the residents who engage in such activities in the IME adjustment formula.

Second, there is no requirement that scholarly activities, including research, must be deemed to occur within the "portion" of the hospital that is subject to PPS. (*See* Defendants' Objection at page 6.) Indeed, for the Secretary to even ask this question, is to expose his misplaced attempt to rewrite the applicable IME regulation. The Secretary seeks to graft on the regulation a requirement that the portion of the hospital subject to the PPS system must be determined based on the type of activity that residents engage in while they are present in the hospital at any given moment.[2] But this is a completely unreasonable and unjustified interpretation of the plain language of the applicable statute and regulation. Rather, the pertinent

---

[2] The Secretary attempts to draw support from a Fourth Circuit case involving disproportionate share ("DSH") payments. *District Memorial Hosp. of Southwestern North Carolina, Inc. Thompson*, 364 F.3d 513 (4th Cir. 2004) ("*District Memorial*"). He suggests that the "'portion of the Hospital' that is subject to the PPS" was not an attempt to carve out cost-reimbursed units from the PPS system, but was, rather, an artful attempt to describe the activities taking place in the hospital. Defendants' Objection at 7-8. Contrary to the government's tortured reading, the reasoning in *District Memorial* advances RIH's position. The Fourth Circuit examined the exclusion of "swing beds" from the PPS unit. The goal in *District Memorial* was to separate swing beds used for PPS from the times the same bed is used for a non-PPS department. *District Memorial,* 364 F.3d at 520. The same is true in this case, the residents and interns' assignment is either to the PPS portion or a PPS exempt unit (*i.e*., a cost-based reimbursed unit). The express goal of the exclusion of residents assigned to cost-based units was to avoid paying twice for the indirect IME costs. Similarly, the goal of excluding the SNF swing bed days was to avoid paying disproportionate share hospital payments for a non-hospital bed subject to the cost-reimbursement methodology. Moreover, in relying exclusively on the Fourth Circuit's decision in *District Memorial*, the Secretary largely ignores the Ninth Circuit's decision in *Alhambra Hospital v. Thompson*, 259 F.3d 1071 (9th Cir. 2001) ("*Alhambra Hospital*") in which the court also considered a disproportionate share hospital regulation, but adopted a geographic-based definition as the government attempted to exclude sub-acute care units which – unlike the SNF units in *District Memorial* – are paid for under the PPS. *See Alhambra Hospital,* 259 F.3d 1071 at 1075. Thus, in that circumstance, there was no basis upon which to support the Secretary's exclusion from the DSH payment adjustment of certain units subject to the PPS.

question to be answered, as set forth in the regulation in effect in 1996, 42 C.F.R. § 412.105(f)(1), is whether the resident was assigned to a portion of the hospital subject to the PPS system or to an out-patient department (i.e., not to a PPS-exempt unit) – and not whether, at any given time, the resident was engaging in activities (such as research) that the Secretary believes were unnecessary for the efficient delivery of patient care.[3]

The requirement that residents be assigned to the PPS portion or an outpatient department was simply intended to prevent Medicare for paying for the indirect costs of the residents twice. In the hospital cost-based units (for example, psychiatric or rehabilitation units) the indirect costs were already included – so there would be no reason to provide an additional payment for such indirect costs. Thus, residents assigned to those units already had their indirect costs paid. Such was not the case for the resident assigned to any other unit of the hospital that was not cost based. Thus, all other residents would be counted for determining a hospital's FTE count. Indeed, in the 1985 IME rule, CMS repeatedly stated that the purpose of the "PPS portion" principle was to prevent double payment to hospitals. 50 Fed. Reg. 35646, 1985 WL 125112, at 64-66 (Sept. 3, 1985). Because the indirect costs of residents who are assigned to cost reimbursed units (*e.g.*, psychiatric and rehabilitation units) are included in the "overall costs of the unit" through cost-based reimbursement, these indirect costs are excluded from the IME count. *Id*. The remaining residents (*e.g*., all other residents) who are assigned to the PPS unit

---

[3] Contrary to the Secretary's argument, the regulatory language requiring that the residents be "assigned to . . . the portion of the hospital subject to PPS," does not imply a "direct patient care" requirement. As the *Riverside Methodist* court put it:

> "The difference between assigned and non-assigned areas has nothing to do, however, with the Secretary's attempt in this case to draw distinctions among the types of activities required of a resident who is assigned to an area of the hospital subject to the prospective payment system or the outpatient department of the hospital."

*Riverside Methodist* at 34. Indeed, a similar argument by the Secretary was rejected by the 9th Circuit in the case of *Alhambra Hospital v. Thompson*, where the Court said that "The regulations begin with the presumption that an area is covered by PPS, unless specifically exempted."

and their indirect costs are paid through the IME payment adjustment. As clearly explained by CMS, "making an additional payment under the provisions of the indirect medical education adjustment to reflect the presence of interns and residents would be a duplicate payment" for residents not assigned to a PPS unit. *Id*.

The IME payment recognizes that teaching hospitals have higher patient-care costs beyond the additional direct medical-education costs. The adjustment is an estimate, or "proxy," based on the high degree of correlation between teaching activity at a hospital and its higher operating costs. Thus, the Secretary, in explaining why an IME adjustment was necessary, stated: "Our analysis of the data we used to derive the proposed limits shows that, even after education program costs have been removed, there is a high degree of correlation between a hospital's level of general inpatient routine operating costs and the extent of its teaching activity. . . . To obtain this adjustment, a teaching hospital would not be required to identify explicitly the costs for which the adjustment is being paid. Instead, <u>the hospital would be required only to report to its Medicare intermediary</u>, 30 days before the beginning of each cost reporting period, <u>the total full time equivalent [FTE] interns and residents</u> [in approved programs] <u>it will employ on the first day of the period</u>." *Id.* (emphasis added). 45 Fed. Reg. 21584 (April 1, 1980).

The IME statute states that the Secretary's computation of the adjustment shall be done "in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983)." 42 U.S.C. § 1395ww(d)(5)(B). The Secretary cannot dispute that there was no exclusion for research time prior to 1983; rather the Secretary twists the plain language to read "in the same manner" as ranging from "completely identical in every detail" to "somewhat similar in relevant essentials." (*See* Defendants' Objection at page 18.)

Third, the question is not whether there is anything in the authorizing statute that unambiguously forbids the Secretary's interpretation. (*See* Defendants' Objection at page 4.) The question is whether the statute and regulation are unambiguous. As the District Court in Ohio found, "the regulation in question [42 C.F.R. § 412.105(f)] is, as noted earlier, in very plain language; it is not in the slightest ambiguous or in need of any interpretation by anyone." *Riverside Methodist Hospital v. Thompson* (S.D. Ohio, 2003).

> "While the phrase 'total time necessary to fill a residency slot' is not specifically defined in the regulation, it can only reasonably read to include time spent by residents participating in required educational activities (which of course, include, but certainly are not limited to, activities involving participation in the direct care and treatment of patients), because such activities would be 'necessary to fill a residency slot'."

*Riverside Methodist Hospital*, *supra*. As the court in *Riverside* further noted:

> "It is precisely because the indirect costs of medical education cannot be so measured [*i.e.*, based on the costs for the individual activities in a resident's required program] that Congress developed a formula, which is not based on the specific nature of each resident activity or the cost of each activity, but rather is based on the intensity of the entire accredited teaching program, a program that requires various types of teaching and learning experiences." *Id.*

**CONCLUSION**

For the reasons set forth here and in the memorandum in support of RIH's motion for summary judgment, the Court should declare that the Secretary's interpretation is unreasonable and reject it as entirely unjustified by the plain language of the statute and regulation.

RHODE ISLAND HOSPITAL

By its counsel,

/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1785)
Mitchell R. Edwards (#6942)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (facsimile)
rflanders@haslaw.com
medwards@haslaw.com

Lawrence W. Vernaglia (admitted *pro hac*)
Foley & Lardner LLP
111 Huntington Ave.
Boston, MA 02199
(617) 342-4079
(617) 342-4001 (facsimile)
lvernaglia@foley.com

Dated: January 30, 2007

**CERTIFICATION**

I hereby certify that on January 30, 2007, a copy of the foregoing Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Robert G. Flanders, Jr.